# NEIL, WARDEN *v.* BIGGERS

No. 71-586. Argued October 18-19, 1972—
Decided December 6, 1972

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which DOUGLAS and STEWART, JJ., joined, *post*, p. 201. MARSHALL, J., took no part in the consideration or decision of the case.

*Bart C. Durham III*, Assistant Attorney General of Tennessee, argued the cause for petitioner. With him on the brief was *David M. Pack,* Attorney General.

*Michael Meltsner* argued the cause for respondent. With him on the brief were *Jack Greenberg, Anthony G. Amsterdam, Avon N. Williams, Jr.,* and *Z. Alexander Looby.*

*Louis J. Lefkowitz,* Attorney General of New York, *pro se, Samuel A. Hirshowitz,* First Assistant Attorney General, and *Maria L. Marcus,* Assistant Attorney General, filed a brief for the Attorney General of New York as *amicus curiae* urging reversal.

*Shirley Fingerhood, Richard G. Green, Burt Neuborne,* and *Melvin L. Wulf* filed a brief for the American Civil Liberties Union as *amicus curiae* urging affirmance.

MR. JUSTICE POWELL delivered the opinion of the Court.

In 1965, after a jury trial in a Tennessee court, respondent was convicted of rape and was sentenced to 20 years' imprisonment. The State's evidence consisted in part of testimony concerning a station-house identification of respondent by the victim. The Tennessee Supreme Court affirmed. *Biggers* v. *State,* 219 Tenn. 553, 411 S. W. 2d 696 (1967). On certiorari, the judgment of the Tennessee Supreme Court was affirmed by an equally divided Court. *Biggers* v. *Tennessee,* 390 U. S. 404 (1968) (MARSHALL, J., not participating). Respondent then brought a federal habeas corpus action raising several claims. In reply,

petitioner contended that the claims were barred by 28 U. S. C. § 2244 (c), which provides in pertinent part:

> "In a habeas corpus proceeding brought in behalf of a person in custody pursuant to the judgment of a State court, a prior judgment of the Supreme Court of the United States on an appeal or review by a writ of certiorari at the instance of the prisoner of the decision of such State court, shall be conclusive as to all issues of fact or law with respect to an asserted denial of a Federal right which constitutes ground for discharge in a habeas corpus proceeding, actually adjudicated by the Supreme Court therein . . . ."

The District Court held that the claims were not barred and, after a hearing, held in an unreported opinion that the station-house identification procedure was so suggestive as to violate due process. The Court of Appeals affirmed. 448 F. 2d 91 (1971). We granted certiorari to decide whether an affirmance by an equally divided Court is an actual adjudication barring subsequent consideration on habeas corpus, and, if not, whether the identification procedure violated due process. 405 U. S. 954 (1972).

I

The intended scope of the phrase "actually adjudicated by the Supreme Court" must be determined by reference to the peculiarities of federal court jurisdiction and the context in which § 2244 (c) was enacted. Jurisdiction to hear state prisoner claims on habeas corpus was first expressly conferred on the federal courts by the Judiciary Act of 1867, c. 28, 14 Stat. 385. Thereafter, decisions of this Court established not only that *res judicata* was inapplicable, *e. g., Salinger* v. *Loisel,* 265 U. S. 224, 230 (1924); *Fay* v. *Noia,* 372 U. S. 391, 423

(1963), but also that federal courts were obliged in appropriate cases to redetermine issues of fact and federal law. By the same token, the Court developed a number of limiting principles to restrain open-ended relitigation, among them that a successive habeas corpus application raising grounds rejected in a previous application might be denied without reaching the merits. *Salinger* v. *Loisel, supra,* at 231.

In 1948, Congress codified a version of the *Salinger* rule in 28 U. S. C. § 2244. As redesignated and amended in 1966, § 2244 (b) shields against senseless repetition of claims by state prisoners without endangering the principle that each is entitled, other limitations aside, to a redetermination of his federal claims by a federal court on habeas corpus. With this in mind, the purpose of § 2244 (c), also enacted in 1966, becomes clear. This subsection embodies a recognition that if this Court has "actually adjudicated" a claim on direct appeal or certiorari, a state prisoner has had the federal redetermination to which he is entitled. A subsequent application for habeas corpus raising the same claims would serve no valid purpose and would add unnecessarily to an already overburdened system of criminal justice.[1]

In this light, we review our cases explicating the disposition "affirmed by an equally divided Court." On what was apparently the first occasion of an equal di-

---

[1] The legislative history adds little. The Senate Report states, cryptically, that "[t]his subsection is intended to give a conclusive presumption only to actual adjudications of Federal rights, by the Supreme Court, and not to give such a presumption to mere denials of writs of certiorari." S. Rep. No. 1797, 89th Cong., 2d Sess., 2 (1966). We conclude from this only that Congress did not expressly address itself to the effect of an affirmance by an equally divided Court. Nor is this surprising in view of the rarity of such divided affirmances in criminal cases.

vision, *The Antelope,* 10 Wheat. 66 (1825), the Court simply affirmed on the point of division without much discussion. *Id.,* at 126–127. Faced with a similar division during the next Term, the Court again affirmed, Chief Justice Marshall explaining that "the principles of law which have been argued, cannot be settled; but the judgment is affirmed, the court being divided in opinion upon it." *Etting* v. *Bank of the United States,* 11 Wheat. 59, 78 (1826). As was later elaborated, in such cases it is the appellant or petitioner who asks the Court to overturn a lower court's decree.

> "If the judges are divided, the reversal cannot be had, for no order can be made. The judgment of the court below, therefore, stands in full force. It is, indeed, the settled practice in such case to enter a judgment of affirmance; but this is only the most convenient mode of expressing the fact that the cause is finally disposed of in conformity with the action of the court below, and that that court can proceed to enforce its judgment. The legal effect would be the same if the appeal, or writ of error, were dismissed." *Durant* v. *Essex Co.,* 7 Wall. 107, 112 (1869).

Nor is an affirmance by an equally divided Court entitled to precedential weight. *Ohio ex rel. Eaton* v. *Price,* 364 U. S. 263, 264 (1960). We decline to construe § 2244 (c)'s bar as extending to claims on which the judgment of a state court stands because of the absence of a majority position in this Court, and accordingly conclude that the courts below properly reached the merits.[2]

---

[2] We have been aided, and are confirmed in this view, by the thoughtful opinion of Judge Mansfield in *United States ex rel. Radich* v. *Criminal Ct. of City of New York,* 459 F. 2d 745 (CA2 1972), pet. for cert. pending *sub nom. Ross* v. *Radich,* No. 71–1510.

## II

We proceed, then, to consider respondent's due process claim.[3]  As the claim turns upon the facts, we must first review the relevant testimony at the jury trial and at the habeas corpus hearing regarding the rape and the identification.  The victim testified at trial that on the evening of January 22, 1965, a youth with a butcher knife grabbed her in the doorway to her kitchen:

> "A. [H]e grabbed me from behind, and grappled— twisted me on the floor.  Threw me down on the floor.
>
> "Q. And there was no light in that kitchen?

---

[3] The dissent would have us decline to address the merits because the District Court, after an evidentiary hearing, found due process to have been violated, and the Court of Appeals—after reviewing the entire record—found that "the conclusions of fact of the District Judge are [not] clearly erroneous."  448 F. 2d 91, 95.  It is said that we should not depart from "our long-established practice not to reverse findings of fact concurred in by two lower courts unless shown to be clearly erroneous."  *Post,* at 202.  This rule of practice, under which the Court does not lightly overturn the concurrent findings of fact of two lower federal courts, is a salutary one to be followed where applicable.  We think it inapplicable here where the dispute between the parties is not so much over the elemental facts as over the constitutional significance to be attached to them.  Moreover, this is a habeas corpus case in which the facts are contained primarily in the state court record (equally available to us as to the federal courts below) and where the evidentiary hearing in the District Court purported to be "confined" to two specific issues which we deem not controlling.  Of the nine cases cited in the dissenting opinion in support of the rule of practice urged upon us, eight of them involved civil litigation in the federal system.  Only one of the cases cited, *Boulden* v. *Holman,* 394 U. S. 478 (1969), involved a habeas corpus review and the Court simply held—on the basis of "an independent study of the entire record"—that the conclusion reached by the District Court and the Court of Appeals "was justified."  *Id.,* at 480, 481.

"A. Not in the kitchen.

"Q. So you couldn't have seen him then?

"A. Yes, I could see him, when I looked up in his face.

"Q. In the dark?

"A. He was right in the doorway—it was enough light from the bedroom shining through. Yes, I could see who he was.

"Q. You could see? No light? And you could see him and know him then?

"A. Yes." Tr. of Rec. in No. 237, O. T. 1967, pp. 33–34.

When the victim screamed, her 12-year-old daughter came out of her bedroom and also began to scream. The assailant directed the victim to "tell her [the daughter] to shut up, or I'll kill you both." She did so, and was then walked at knifepoint about two blocks along a railroad track, taken into a woods, and raped there. She testified that "the moon was shining brightly, full moon." After the rape, the assailant ran off, and she returned home, the whole incident having taken between 15 minutes and half an hour.

She then gave the police what the Federal District Court characterized as "only a very general description," describing him as "being fat and flabby with smooth skin, bushy hair and a youthful voice." Additionally, though not mentioned by the District Court, she testified at the habeas corpus hearing that she had described her assailant as being between 16 and 18 years old and between five feet ten inches and six feet tall, as weighing between 180 and 200 pounds, and as having a dark brown complexion. This testimony was substantially corroborated by that of a police officer who was testifying from his notes.

On several occasions over the course of the next seven months, she viewed suspects in her home or at the police

station, some in lineups and others in showups, and was shown between 30 and 40 photographs. She told the police that a man pictured in one of the photographs had features similar to those of her assailant, but identified none of the suspects. On August 17, the police called her to the station to view respondent, who was being detained on another charge. In an effort to construct a suitable lineup, the police checked the city jail and the city juvenile home. Finding no one at either place fitting respondent's unusual physical description, they conducted a showup instead.

The showup itself consisted of two detectives walking respondent past the victim. At the victim's request, the police directed respondent to say "shut up or I'll kill you." The testimony at trial was not altogether clear as to whether the victim first identified him and then asked that he repeat the words or made her identification after he had spoken.[4] In any event, the victim testified that she had "no doubt" about her identification. At the habeas corpus hearing, she elaborated in response to questioning.

"A. That I have no doubt, I mean that I am sure that when I—see, when I first laid eyes on him, I

---

[4] At trial, one of the police officers present at the identification testified explicitly that the words were spoken after the identification. The victim testified:

"Q. What physical characteristics, if any, caused you to be able to identify him?

"A. First of all,—uh—his size,—next I could remember his voice.

"Q. What about his voice? Describe his voice to the Jury.

"A. Well, he has the voice of an immature youth—I call it an immature youth. I have teen-age boys. And that was the first thing that made me think it was the boy." Tr. of Rec. in No. 237, O. T. 1967, p. 17.

The colloquy continued, with the victim describing the voice and other physical characteristics. At the habeas corpus hearing, the victim and all of the police witnesses testified that a visual identification preceded the voice identification. App. 80, 123, 134.

knew that it was the individual, because his face—well, there was just something that I don't think I could ever forget. I believe——

"Q. You say when you first laid eyes on him, which time are you referring to?

"A. When I identified him—when I seen him in the courthouse when I was took up to view the suspect." App. 127.

We must decide whether, as the courts below held, this identification and the circumstances surrounding it failed to comport with due process requirements.

## III

We have considered on four occasions the scope of due process protection against the admission of evidence deriving from suggestive identification procedures. In *Stovall* v. *Denno,* 388 U. S. 293 (1967), the Court held that the defendant could claim that "the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that he was denied due process of law." *Id.,* at 301–302. This, we held, must be determined "on the totality of the circumstances." We went on to find that on the facts of the case then before us, due process was not violated, emphasizing that the critical condition of the injured witness justified a showup in her hospital room. At trial, the witness, whose view of the suspect at the time of the crime was brief, testified to the out-of-court identification, as did several police officers present in her hospital room, and also made an in-court identification.

Subsequently, in a case where the witnesses made in-court identifications arguably stemming from previous exposure to a suggestive photographic array, the Court restated the governing test:

"[W]e hold that each case must be considered on its own facts, and that convictions based on eye-

witness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U. S. 377, 384 (1968).

Again we found the identification procedure to be supportable, relying both on the need for prompt utilization of other investigative leads and on the likelihood that the photographic identifications were reliable, the witnesses having viewed the bank robbers for periods of up to five minutes under good lighting conditions at the time of the robbery.

The only case to date in which this Court has found identification procedures to be violative of due process is *Foster* v. *California,* 394 U. S. 440, 442 (1969). There, the witness failed to identify Foster the first time he confronted him, despite a suggestive lineup. The police then arranged a showup, at which the witness could make only a tentative identification. Ultimately, at yet another confrontation, this time a lineup, the witness was able to muster a definite identification. We held all of the identifications inadmissible, observing that the identifications were "all but inevitable" under the circumstances. *Id.,* at 443.

In the most recent case of *Coleman* v. *Alabama,* 399 U. S. 1 (1970), we held admissible an in-court identification by a witness who had a fleeting but "real good look" at his assailant in the headlights of a passing car. The witness testified at a pretrial suppression hearing that he identified one of the petitioners among the participants in the lineup before the police placed the participants in a formal line. MR. JUSTICE BRENNAN for four members of the Court stated that this evidence could support a finding that the in-court identification was

"entirely based upon observations at the time of the assault and not at all induced by the conduct of the lineup." *Id.*, at 5–6.

Some general guidelines emerge from these cases as to the relationship between suggestiveness and misidentification. It is, first of all, apparent that the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States*, 390 U. S., at 384. While the phrase was coined as a standard for determining whether an in-court identification would be admissible in the wake of a suggestive out-of-court identification, with the deletion of "irreparable" it serves equally well as a standard for the admissibility of testimony concerning the out-of-court identification itself.[5] It is the likelihood of misidentification which violates a defendant's right to due process, and it is this which was the basis of the exclusion of evidence in *Foster*. Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous. But as *Stovall* makes clear, the admission of evidence of a showup without out more does not violate due process.

What is less clear from our cases is whether, as intimated by the District Court, unnecessary suggestiveness

---

[5] See *Clemons* v. *United States*, 133 U. S. App. D. C. 27, 47, 408 F. 2d 1230, 1250 (1968) (McGowan, J., for the court *en banc*), cert. denied, 394 U. S. 964 (1969). In the present case, there has been controversy, in our view irrelevant, over whether, as she testified at the habeas corpus hearing, the victim actually made an in-court identification. While we think it evident from the many testimonial links between her out-of-court identification and "the defendant" before her in court that the answer is "yes," we recognize that if the testimony concerning the out-of-court identification was inadmissible, the conviction must be overturned.

alone requires the exclusion of evidence.[6]  While we are inclined to agree with the courts below that the police did not exhaust all possibilities in seeking persons physically comparable to respondent, we do not think that the evidence must therefore be excluded.  The purpose of a strict rule barring evidence of unnecessarily suggestive confrontations would be to deter the police from using a less reliable procedure where a more reliable one may be available, and would not be based on the assumption that in every instance the admission of evidence of such a confrontation offends due process.  *Clemons* v. *United States,* 133 U. S. App. D. C. 27, 48, 408 F. 2d 1230, 1251 (1968) (Leventhal, J., concurring); cf. *Gilbert* v. *California,* 388 U. S. 263, 273 (1967); *Mapp* v. *Ohio,* 367 U. S. 643 (1961).  Such a rule would have no place in the present case, since both the confrontation and the trial preceded *Stovall* v. *Denno, supra,* when we first gave notice that the suggestiveness of confrontation procedures was anything other than a matter to be argued to the jury.

We turn, then, to the central question, whether under the "totality of the circumstances" the identification was reliable even though the confrontation procedure was suggestive.  As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time

---

[6] The District Court stated:

"In this case it appears to the Court that a line-up, which both sides admit is generally more reliable than a show-up, could have been arranged.  The fact that this was not done tended needlessly to decrease the fairness of the identification process to which petitioner was subjected." App. 42.

between the crime and the confrontation. Applying these factors, we disagree with the District Court's conclusion.

In part, as discussed above, we think the District Court focused unduly on the relative reliability of a lineup as opposed to a showup, the issue on which expert testimony was taken at the evidentiary hearing. It must be kept in mind also that the trial was conducted before *Stovall* and that therefore the incentive was lacking for the parties to make a record at trial of facts corroborating or undermining the identification. The testimony was addressed to the jury, and the jury apparently found the identification reliable. Some of the State's testimony at the federal evidentiary hearing may well have been self-serving in that it too neatly fit the case law, but it surely does nothing to undermine the state record, which itself fully corroborated the identification.

We find that the District Court's conclusions on the critical facts are unsupported by the record and clearly erroneous. The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes.[7] Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough. She had "no doubt" that respondent was the person who raped her. In the nature of the crime, there are rarely witnesses to a rape other than the victim, who often has a limited

---

[7] See *United States ex rel. Phipps* v. *Follette,* 428 F. 2d 912, 915–916 (CA2) (Friendly, J.), cert. denied, 400 U. S. 908 (1970).

opportunity of observation.[8] The victim here, a practical nurse by profession, had an unusual opportunity to observe and identify her assailant. She testified at the habeas corpus hearing that there was something about his face "I don't think I could ever forget." App. 127.

There was, to be sure, a lapse of seven months between the rape and the confrontation. This would be a seriously negative factor in most cases. Here, however, the testimony is undisputed that the victim made no previous identification at any of the showups, lineups, or photographic showings. Her record for reliability was thus a good one, as she had previously resisted whatever suggestiveness inheres in a showup. Weighing all the factors, we find no substantial likelihood of misidentification. The evidence was properly allowed to go to the jury.[9]

*Affirmed in part, reversed in part, and remanded.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE STEWART concur, concurring in part and dissenting in part.

We granted certiorari in this case to determine whether our affirmance by an equally divided Court of respondent's state conviction constitutes an actual adjudication

---

[8] Respondent attaches some weight to the failure of the victim's daughter to identify him. Apart from the fact that this does not bear directly on the reliability of her mother's identification, the girl was only 12 years old and had, as best we can tell, only a very brief view of the assailant from across the room.

[9] Respondent's habeas corpus petition raised a number of other claims, including one challenging the legality of his detention at the time he was viewed by the victim. The courts below did not address these claims, nor do we.

within the meaning of 28 U. S. C. § 2244 (c), and thus bars subsequent consideration of the same issues on federal habeas corpus. The Court holds today that such an affirmance does not bar further federal relief, and I fully concur in that aspect of the Court's opinion. Regrettably, however, the Court also addresses the merits and delves into the factual background of the case to reverse the District Court's finding, upheld by the Court of Appeals, that under the "totality of the circumstances," the pre-*Stovall* showup was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification. This is an unjustified departure from our long-established practice not to reverse findings of fact concurred in by two lower courts unless shown to be clearly erroneous. See, *e. g., Blau* v. *Lehman*, 368 U. S. 403, 408–409 (1962); *Faulkner* v. *Gibbs*, 338 U. S. 267, 268 (1949); *United States* v. *Dickinson*, 331 U. S. 745, 751 (1947); *United States* v. *Commercial Credit Co.*, 286 U. S. 63, 67 (1932); *United States* v. *Chemical Foundation*, 272 U. S. 1, 14 (1926); *Baker* v. *Schofield*, 243 U. S. 114, 118 (1917); *Towson* v. *Moore*, 173 U. S. 17, 24 (1899); cf. *Boulden* v. *Holman*, 394 U. S. 478, 480–481 (1969).

As the Court recognizes, a pre-*Stovall* identification obtained as a result of an unnecessarily suggestive showup may still be introduced in evidence if, under the "totality of the circumstances," the identification retains strong indicia of reliability. After an extensive hearing and careful review of the state court record, however, the District Court found that, under the circumstances of this case, there existed an intolerable risk of misidentification. Moreover, in making this determination, the court specifically found that "the complaining witness did not get an opportunity to obtain a good view of the suspect during the commission of the crime," "the show-up confrontation was not conducted near the time of the alleged crime, but, rather, some seven months after its com-

mission," and the complaining witness was unable to give "a good physical description of her assailant" to the police. App. 41–42. The Court of Appeals, which conducted its own review of the record, upheld the District Court's findings in their entirety. 448 F. 2d 91, 95 (CA6 1971).

Although this case would seem to fall squarely within the bounds of the "two-court" rule, the Court seems to suggest that the rule is "inapplicable here" because "this is a habeas corpus case in which the facts are contained primarily in the state court record (equally available to us as to the federal courts below) . . . ." *Ante,* at 193 n. 3. The "two-court" rule, however, rests upon more than mere deference to the trier of fact who has a firsthand opportunity to observe the testimony and to gauge the credibility of witnesses. For the rule also serves as an indispensable judicial "time-saver," making it unnecessary for this Court to waste scarce time and resources on minor factual questions which have already been accorded consideration by two federal courts and whose resolution is without significance except to the parties immediately involved. Thus, the "two-court" rule must logically apply even where, as here, the lower courts' findings of fact are based primarily upon the state court record.

The Court argues further, however, that the rule is irrelevant here because, in its view, "the dispute between the parties is not so much over the elemental facts as over the constitutional significance to be attached to them." *Ante,* at 193 n. 3. I cannot agree. Even a cursory examination of the Court's opinion reveals that its concern is not limited solely to the proper application of legal principles but, rather, extends to an essentially *de novo* inquiry into such "elemental facts" as the nature of the victim's opportunity to observe the assailant and the type of description the victim gave

the police at the time of the crime. And although we might reasonably disagree with the lower courts' findings as to such matters, the "two-court" rule wisely inhibits us from cavalierly substituting our own view of the facts simply because we might adopt a different construction of the evidence or resolve the ambiguities differently. On the contrary, these findings are "final here in the absence of very exceptional showing of error." *Comstock* v. *Group of Institutional Investors,* 335 U. S. 211, 214 (1948). The record before us is simply not susceptible of such a showing and, indeed, the petitioner does not argue otherwise. I would therefore dismiss the writ of certiorari as improvidently granted insofar as it relates to Question 2 of the Questions Presented.