381 S.E.2d 265

**STATE of West Virginia**

v.

**Ronnie C. WILLIAMS.**

No. 18650.

Supreme Court of Appeals of
West Virginia.

May 17, 1989.

Robert Jacobs, Bickley, Jacobs & Barkus, Charleston, for Ronnie C. Williams.

C. Terry Owens, Sr. Asst. Atty. Gen., Charleston, for appellee.

NEELY, Justice:

The appellant was convicted of bank robbery in his second trial by a jury. At issue is the admissibility of an incourt identification of appellant as one of two persons involved in the robbery.

Just before 2:00 p.m. on 5 March 1986, two black males robbed $8,600 from Cabell Federal Savings and Loan on Eighth Street in Huntington, West Virginia. One of the men, apprehended just after the robbery and identified as William Felder, brandished a gun during the robbery. The other robber was wearing sunglasses and a "salt and pepper" wig backwards. Appellant was identified by a bank employee as the other robber in a lineup and at trial.

A police officer heard the robbery reported on the radio and gave chase to two black males driving a brown Chrysler K car with out-of-state license tags in the vicinity of the robbery. The officer lost the car but saw William Felder fleeing on foot and reported him to other officers who arrested Mr. Felder. Mr. Felder later pled guilty to armed robbery.

The officer continued his search and stated that at one point he saw the brown Chrysler driven by a single black male and was able to identify the license plate as Ohio, 363–HBU. The car was subsequently found abandoned, and a search warrant revealed a pair of sunglasses of the type worn by Mr. Felder's accomplice and a pellet pistol. Mr. Felder reported that his accomplice in the robbery was Gary Jackson.

William Felder had come to Huntington on 28 February 1986 from Dayton, Ohio, with appellant and appellant's girlfriend,

Darla Jackson.[1] They drove to Huntington in a brown Chrysler K car with Ohio license 363–HBU, rented from Snappy Car Rental in Dayton, Ohio, by Ms. Jackson and appellant. When appellant, Ms. Jackson and Mr. Felder arrived in Huntington, they went to the house of Ms. Jackson's sister, Deborah K. Uziogwe. Appellant's family also lives in Huntington, and appellant testified that he spent much of the five days in Huntington visiting with his family. Appellant also testified that he and Ms. Jackson went to Huntington to get his father to co-sign a student loan so he could go to the University of Dayton.[2] He also stated that he met Mr. Felder shortly before the trip and that Mr. Felder asked for a ride to Huntington.

Mrs. Uziogwe's identification card was used on 4 March 1986 when Darla Jackson purchased a .38 caliber revolver from Ace Trading Post. On 5 March 1986, at about 10:00 a.m., appellant and William Felder purchased four pairs of rubber gloves and a pellet pistol of the same type as that later found in the abandoned car. Mr. Felder reportedly said it was important for the gun to look realistic because his son had to use it in a play.

Mrs. Uziogwe testified that appellant returned to her house alone the afternoon of 5 March and asked for a razor, which he used to shave off his moustache and goatee. She testified that appellant then asked her for rubber bands and, when she returned with the rubber bands, she saw that appellant had an inch thick stack of bills. Her sister (Ms. Jackson), appellant and appellant's brother were dividing the bills into separate piles. Mrs. Uziogwe asked her sister, appellant and appellant's brother to leave her house. Appellant and his aunt testified that appellant's aunt gave appellant $700 for him to return to college. Appellant, his father and his aunt all testified that he was at the family house from mid-

morning until 4:00 p.m. on 5 March, the day of the robbery.

Appellant and Darla Jackson returned to Dayton, Ohio, where appellant was arrested several days later. He waived extradition and was returned to West Virginia, where he was brought before a magistrate, informed of the charges against him, and had a bond set on 11 March 1986. On 12 March 1986, appellant was required to participate in a lineup. He requested counsel, and a lawyer, Philip Duff, was contacted. Although Mr. Duff was present at the lineup, he did not understand that he had been appointed to represent appellant. Instead, he believed that he was present merely as an observer on behalf of the court. Originally the lineup included five men. Appellant objected to its composition claiming there was no one else as dark complected as he, and that one of the men had very light skin. Mr. Duff noted that indeed one of the men had very light skin and pointed this fact out to the police who then removed the light-skinned man.

During the lineup, one bank employee, Ann Kipp, positively identified a suspect other than appellant, and another bank employee, Rebecca Preston, tentatively identified the appellant. Appellant was originally tried in February, 1987, but the proceedings ended with a mistrial. The judge had earlier ruled that the lineup identification should be suppressed because appellant was not, in fact, represented by counsel at the time in spite of his request for representation. Appellant's counsel originally understood that the judge was suppressing *any* identification of appellant by Mrs. Preston. When it appeared that the court would allow an in-court identification of the appellant, appellant's counsel made his successful motion for a mistrial.

Appellant was again tried in April, 1987. On 24 April, after hearing an unequivocal courtroom identification of appellant by Mrs. Preston, a jury convicted appellant of

---

**1.** Darla Jackson also uses the name "Darla Williams" as appellant's reputed common law wife.

**2.** Appellant has an associate degree from two years of college. Appellant appeared *pro se* in

all his written briefs for this appeal and is admittedly talented in the legal field. Whether his talent is innate or the product of "on the job training," we cannot say.

bank robbery and, in reply to a special interrogatory, found that appellant did not employ a firearm during the robbery.

Appellant now argues that the lineup identification tainted the subsequent in-court identification by Mrs. Preston and, therefore, the in-court identification was inadmissible.[3] The State maintains that it established an independent basis for Mrs. Preston's in-court identification sufficient to remove any prejudice resulting from the lineup identification under the rule set forth in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); and adopted by this Court in *State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976).

In *Wade, supra,* the defendant was charged with bank robbery and identified by bank employees at a pre-trial lineup conducted without counsel. The employees also identified the defendant at trial. The court held that defendant had a sixth amendment right to have counsel at the pre-trial lineup. The court then addressed the question of whether the identification at trial should be excluded. On the one hand, the court pointed out that to exclude a lineup identification while admitting a courtroom identification eviscerates the defendant's right to counsel.

A rule limited solely to the exclusion of testimony concerning identification at the lineup itself, without regard to admissibility of the courtroom identification, would render the right to counsel an empty one. The lineup is most often used, as in the present case, to crystallize the witnesses' identification of the defendant for future reference. We have already noted that the lineup identification will have that effect. The State may then rest upon the witnesses' unequivocal courtroom identification, and not mention the pretrial identification as part of the State's case at trial. Counsel is then in the predicament in which Wade's counsel found himself—realizing that possible unfairness at the lineup may be the sole means of attack upon the unequivocal courtroom identification, and having to probe in the dark in an attempt to discover and reveal unfairness, while bolstering the government witness' courtroom identification by bringing out and dwelling upon his prior identification. Since counsel's presence at the lineup would equip him to attack not only the lineup identification but the courtroom identification as well, limiting the impact of violation of the right to counsel to exclusion of evidence only of identification at the lineup itself disregards a critical element of that right.

388 U.S. at 240–41, 87 S.Ct. at 1939.

On the other hand, the court pointed out that where the admissability of the lineup identification is not involved, a *per se* rule of exclusion of courtroom identification is not justified. *Id.* at 240, 87 S.Ct. at 1939. The court held that the government should have

"... the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification."

*Id.* In the alternative, the government can try to establish that the introduction of the in-court identification was harmless error. *Id.* at 242, 87 S.Ct. at 1940.

The question of whether the government establishes a sufficient independent basis for the in-court identification is to be answered by an application of the "totality of the circumstances" test applied in *Neil v. Biggers, supra* and Syl. pt. 3 of *State v. Casdorph, supra,* which says:

"In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity

---

**3.** Although appellant makes and argues several other assignments of error, we do not find it necessary to address them because we find mer-it in this assignment, reverse his conviction and remand the case to the Circuit Court of Cabell County.

of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."

In the case at bar, the lineup identification was properly suppressed by the trial court because appellant requested counsel after he had been brought before a magistrate, informed of the charge against him, and had a bond set. *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972); *Michigan v. Jackson*, 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); Syl. pt. 1, *State v. Gravely*, 171 W.Va. 428, 299 S.E.2d 375 (1982); *State v. Barrow*, 178 W.Va. 406, 359 S.E.2d 844 (1987).

Although Mrs. Preston stated at the time of the trial that she had no doubt about her identification of the appellant at the lineup, such certainty is contradicted by the recollection of Mr. Duff. Mr. Duff testified that he believed himself to be merely an observer of the lineup on behalf of the court and never acted as appellant's counsel. Therefore, because he was the only completely disinterested witness, his recollection of the lineup, refreshed with notes taken at the time, should be accorded great weight. Mr. Duff testified that none of the other three participants was nearly as dark skinned as appellant, and that one was substantially shorter while the other two were three or four inches taller than appellant. Ann Kipps, another bank employee, picked suspect number two without qualification (appellant was number three), but later said it could be either number two or number three after conversing with the other witnesses. Mr. Duff testified that "Rebecca Preston said she couldn't be sure but she thought it might be number 3." Mr. Duff also testified that, in his opinion, no one made a positive identification of any of the four participants in the lineup.

In contrast to this uncertain identification at the lineup, Mrs. Preston testified a year later at the trial that she was certain the second bank robber was appellant.

However, she was unable to identify appellant's picture in a photographic array she was shown after the robbery and before the lineup. It appears from the record that Mrs. Preston's identification of appellant evolved from an uncertain identification just after the robbery to one of absolute certainty a year later.

With no disrespect to Mrs. Preston, we suggest that the cumulative effect of the tainted lineup, exposure to repeated photographic arrays, and seeing appellant in the posture of a criminal defendant during his preliminary hearing were instrumental in her growing certainty of appellant's identity as one of the robbers.

Application of the factors enumerated in the "totality of the circumstances" test quoted earlier demonstrates that in this case, Mrs. Preston's in-court identification should have been excluded. First, the witness' opportunity to view the robber at the time was minimal. She testified that the robber was wearing sunglasses and a wig, and that she saw him for less than five minutes. Second, the witness' original description of the criminal was that he was about 5'7" and 140 pounds, when, in fact, appellant is 5'11" and 205 pounds. Third, in spite of the witness' insistence to the contrary, Mr. Duff's neutral testimony suggests a low level of certainty in her identification of appellant at the lineup. Under these circumstances, we hold that the state failed to show a basis for the in-court identification sufficiently independent of the tainted lineup identification and, therefore, the in-court identification should have been excluded.

Clearly, the state presented a strong circumstantial case against appellant and, even without the courtroom identification by Mrs. Preston, appellant may well have been convicted. Had Mrs. Preston's courtroom identification been a qualified one, such as "I believe it was appellant but I am not positive," we might have found that its admission was harmless error. *See United States v. Wade, supra*. However, at trial, Mrs. Preston's identification of appellant was emphatic and unequivocal, and we cannot in good conscience say that its admis-

**154**

sion was harmless error. In spite of appellant's apparent guilt in this specific case, our decision must be instructed by the more important constitutional principle at issue.

Accordingly, appellant's conviction is reversed, and the case is remanded for a new trial.

Reversed and Remanded.