OPINION OF THE COURT
William D. Friedmann, J.
A "voice identification” confirmed by the immediate exhibit *830 ing of a single photograph of the defendant to the witness is considered in the context of an identification suppression hearing (United States v Wade, 388 US 218 [1967]),
After viewing a seated and standing six-person physical lineup, prospective eyewitness Coleen McKnight indicated that two persons looked familiar (one being the defendant). Ms. McKnight was thereafter taken to the detective lounge area at the 105th Police Precinct. That is a screened-off area created by the placement of standing clothing lockers. Behind a row of these lockers is located holding cells. While in that area, Ms. McKnight is alleged to have heard a voice calling out from a holding cell to police personnel. Upon hearing that voice which had a Jamaican accent, Ms. McKnight is alleged to have stated "that’s the voice. I remember the voice”. Thereafter, defendant’s resident alien card, with his photograph incorporated, was shown to the witness by an investigating detective. Ms. McKnight is then alleged to have stated, "that’s him”.
THE LAW
The identification of a suspect’s voice by a witness is subject to the same constitutional safeguards as other identification procedures such as photo spreads or lineups (see, United States v Pheaster, 544 F2d 353, 369 [9th Cir 1976], cert denied sub nom. Inciso v United States, 429 US 1099 [1977]; United States v Smith, 467 F2d 1126 [7th Cir 1972]; People v Thomas, 44 Mich App 649, 205 NW2d 604 [1973]; State v Jackson, 284 NC 321, 200 SE2d 626 [1973]).
For the general use of voice identification in criminal cases, see Sobel, Eyewitness Identification § 5.6 (Clark Boardman Co.), and relevant authorities, cited therein at footnote 146, and the recent case of People v Carrol (NYLJ, May 20, 1988, at 17, col 5; New York Times, May 20, 1989, at 1; indictment No. 373/1987, appeal pending, Suffolk County).
The record of this happening seems to indicate that the voice identification was not procured through police instigation or arrangement, thus constituting a "voice showup”. Even though it arose in an isolated police setting, it seems to have rather been the product of inadvertent circumstances rather than police planning.
However, the confirmation of the voice identification, immediately after it was heard, by the exhibiting of a single photograph converts the voice identification into a combina *831 tion "voice and photo showup”, which must be considered unduly suggestive, and, therefore, improper (Sobel, op. cit., § 5.3 [fD.
It would seem to this court that the correct procedure, after the voice identification, should have been the conducting of a photo spread and a sequential confirmation voice lineup, analogous to the conducting of a photo spread or physical lineup. In other words, there should have been other fillers (e.g., other voices) selected according to group criteria (Jamaican accented voices).
Reference to procedural recommendations for the conducting of a voice identification procedure, which is not as commonly understood procedure as those involving photo spreads and physical lineups is set in the recent work of Gary L. Wells, Eyewitness Identification (Carswell Publ. Co. 1988). Professor Wells’ relevant recommendations as to the conducting of a voice lineup are:
1) A tape-recorded voice lineup should be used instead of a live vocal lineup with the voices exhibited in sequential order.
2) Filler voices should be selected which have the general characteristics of a suspect’s voice as previously described by witnesses to the crime.
3) During the voice lineup, each person should utter the same words, and the sample speech should be at least 10 words.
4) There should be at least six filler voices, including the suspect’s, exhibited in sequential order.
5) Listeners should be told that a possible suspect might or might not be contained in the sequence of voices.
6) Listeners should listen to all the voices in the lineup even if they have already selected a voice earlier in the sequence.
7) The officer conducting the voice lineup session should not know which voice is that of the suspect.
8) After the listener hears the entire sequence of voices, he or she should be asked if he or she can positively identify any voice as that of the crime perpetrator, and if so, how certain he or she is that the identified voice is in fact that of the crime perpetrator.
9) Voice lineup records should be kept with respect to the voices included, and the exact tape used in the voice identification should be preserved together with information concerning the names and addresses of those persons who have served as filler voices.
*832 CONCLUSION
Accordingly, defendant’s motion to suppress the use of the voice identification and resident alien card identification/confirmation is granted. On balance, such relief should in no way effect the use of the prior indecisive physical lineup or any projected prospective in-court identification by Ms. McKnight. Authorities have allowed trial testimony concerning a lineup and prospective in-court identification in spite of the use of an improper pretrial photo showup (Neil v Biggers, 409 US 188 [1972]; Manson v Brathwaite, 432 US 98 [1977]).