19 F.3d 20
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael J. MOORE, Defendant-Appellant.
 No. 93-3762.
 United States Court of Appeals, Sixth Circuit.
 March 8, 1994.
 
 Before: MERRITT, Chief Judge; GUY and BOGGS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Michael Moore appeals from his jury convictions of armed bank robbery and using a firearm while committing a crime of violence.
 
 
 2
 On appeal, Moore argues that an in-court identification was tainted by an earlier impermissibly suggestive line-up identification. The defendant also claims that there was insufficient evidence to convict him of the firearm offense.
 
 
 3
 Our review of the record leaves us unpersuaded by either of defendant's arguments, and we affirm his convictions.
 
 I.
 
 4
 The Society National Bank in Boardman, Ohio, was robbed by an armed gunman and his accomplice on July 25, 1992. At 8:30 a.m. on that date, the armed robber, a black male who was wearing a ski mask, forced the first employee arriving at the bank to open the door and let him in. He then corralled the other bank employees as they arrived. The gunman was forced to remain in the bank for some time because there was a 15-minute time-lock delay on the vault even after the combination was entered. In the meantime, the robber gathered the American Express travelers checks and the money from both the night depository and the automatic teller machine. He also had the bank employees tie up each other.
 
 
 5
 After the first robber had been in the bank for approximately 25 minutes, his accomplice, another black male, entered wearing a pair of women's hose over his head. This robber was unarmed. At the direction of the armed robber, he checked the ropes on the employees and served as a lookout at the front door, since the bank was due to open to the public at 9:30 a.m. At one point, he removed the nylon stocking from his head, allowing two bank tellers to observe him unmasked.
 
 
 6
 When the vault failed to open, the robbers fled, taking the car of one of the bank employees. They only drove it across the street, however, to where they had parked their getaway car behind a doctor's office. A witness observed two black males, one older and one younger, leave at high rate of speed in a gray Cadillac with a black top.
 
 
 7
 The police arrived shortly after the robbers left, and they conducted a neighborhood investigation. The police learned that employees, at a store located across from the bank, earlier had observed a gray Cadillac driving around the bank several times and had become suspicious. They were able to obtain a partial license number.
 
 
 8
 A vehicle registration check led the FBI to the home of Monica Laury at 2:00 p.m. on the day of the robbery. When the agents were questioning Laury, the defendant drove up. The FBI agents then questioned Moore and he admitted owning a gray Cadillac. The agents asked for permission to search the car Moore was then driving. Moore was initially reluctant, saying the car contained contraband. However, he subsequently agreed to the search, and the agents found a blue bag containing a large amount of cash and a 9mm Beretta pistol. Two hundred dollars was also found under the front seat. Moore initially told the agents this was drug money he was delivering.
 
 
 9
 After being taken to the FBI office, Moore told the agents he had loaned his Cadillac to his father the night before. He claimed to have walked to a card party, from which he did not get home until 6:00 a.m. He said his father came to his house at approximately 11:00 a.m. and gave him the blue bag to hold.
 
 
 10
 Moore was initially indicted for possession of stolen bank money; however, when he was identified by one of the tellers in a line-up, a superseding indictment was handed down that charged him with armed bank robbery and using a firearm in relation to a crime of violence.
 
 
 11
 Prior to trial, Moore moved to suppress any identification testimony, claiming the line-up in which he had been identified was tainted. This motion was denied, and Moore was subsequently convicted on both counts of the indictment.
 
 II.
 A. The Identification Issue
 
 12
 The two bank tellers, who had observed the one bank robber remove his head covering, were brought by police to a line-up. When they were travelling in an elevator to the fourth floor to reach the viewing room, the elevator stopped on the third floor and the defendant, in the company of his attorney and police officers, entered the elevator. The defendant then had to exit the elevator at the fourth floor so the bank tellers could exit, as defendant was not exiting on this floor.
 
 
 13
 There is no question but what this encounter was accidental. When questioned about the encounter, the bank tellers said they were either looking at each other or the floor and never noticed the defendant. One teller was able to make a positive identification of the defendant, but the other teller failed to identify Moore as the unarmed robber.
 
 
 14
 When reviewing a claim of tainted identification evidence, we employ a two-step inquiry. First, was the identification procedure impermissible suggestive? Defendant has the burden of proof on this issue. Second, if the defendant meets his burden, we look to see if the identification was reliable despite its suggestiveness. United States v. Hill, 967 F.2d, 226,m 230 (6th Cir.1992).[1] Our review is do novo, since the admission of identification evidence presents a mixed question of law and fact.
 
 
 15
 Although both sides direct us to a number of cases setting forth tests to determine identification reliability, we find them inapposite. Here, the only taint alleged is that the identifying witnesses saw the defendant on the elevator just prior to the line-up. The witnesses deny seeking the defendant. This presents a credibility determination for the trial judge. He believed the witnesses. We have no basis for finding this determination erroneous. Since we find no taint, there is no need to pursue the second inquiry of the two-part analysis.
 
 B. The Firearms Conviction
 
 16
 Although defendant was not carrying the firearm during the robbery, there is no requirement that he do so to be convicted of aiding and abetting the use of a firearm during the commission of a crime of violence. In just the same manner, several defendants may be convicted of armed bank robbery even though only one was armed. A person who knowingly participates in a robbery is chargeable with a firearms offense as long as he knows a firearm is involved. Here, Moore was in the bank with the armed robber, who was openly brandishing the pistol. Moore's defense is that he was not there at all, but, if that defense is rejected, under these facts, he has no defense to the firearms charge.
 
 
 17
 Moore cites a number of cases in which one person in a group has a firearm and the issue is whether the firearm is chargeable to the other participants. In the cases Moore cites, it is arguably not clear that a firearm is present or being utilized. In these cases, either the defendants are getaway drivers who do not go into the bank, e.g., United States v. Dixon, 743 F.Supp. 1211 (D.Md.1990), or it is not clear that a firearm is actually being used in the commission of the offense, e.g., United States v. Feliz-Cordero, 859 F.2d 250 (2d Cir.1988). None of these conditions prevail here, since Moore was actually in the bank, helping his partner commit the robbery and thus using the firearm that his partner in crime was carrying in order to make the robbery possible.
 
 
 18
 AFFIRMED.
 
 
 
 [1]
 This is the test enunciated by the Supreme Court in Neil v. Biggers, 409 U.S. 188 (1972)