448 S.E.2d 158

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Dewayne E. FRANKLIN, Defendant Below, Appellant.**

No. 21981.

Supreme Court of Appeals of West Virginia.

Submitted May 3, 1994.

Decided July 11, 1994.

Dissenting Opinion of Justice Neely July 12, 1994.

Michele Rusen, Pros. Atty. of Wood County, Parkersburg, for appellee.

Joseph P. Albright, Jr., Albright, Bradley & Ellison, Parkersburg, for appellant.

PER CURIAM:

The appellant, Dewayne E. Franklin, was found guilty, by a jury, of aggravated robbery, in violation of *W.Va.Code*, 61–2–12 [1961], on September 24, 1992, in the Circuit Court of Wood County, West Virginia. On December 31, 1992, he was sentenced to seventeen years in the West Virginia State Penitentiary. Mr. Franklin is now before this Court upon appeal of his conviction. Upon consideration of the petition for appeal, all matters of record and the briefs and argument of counsel, the judgment of the circuit court is affirmed.

I

On October 19, 1991, between 10:00 and 10:30 p.m., the Western Sizzlin' Restaurant, in Parkersburg, West Virginia, was robbed at gunpoint by a black male identified by five witnesses as the appellant, Dewayne E. Franklin (hereinafter "appellant").

Following the robbery, the Parkersburg Police Department prepared several photographic lineups for identification of the assailant. The first lineup, shown to witnesses on the night of the robbery, consisted of five black and white photographs of black males. The appellant's photograph was not included in this lineup. This lineup was shown to Marion Hall, the cashier who was actually held up, and Pam Jobes, the waitress who witnessed the robbery. Neither witness identified anyone in this lineup as the assailant.

According to Detective Ken Miller, he followed the standard procedure for presenting photographs to potential witnesses. He placed the photographs in front of the witnesses without revealing whether the potential suspect was included in the lineup. He showed the photographs to the witnesses individually so one could not influence the identification of the other. He further prevented the witnesses from seeing any identifying information on the back of the photographs and simply asked if there was anyone in the lineup who looked familiar.

The second photographic lineup was prepared within a week of the robbery. Seven black and white photographs, including one of the defendant and another of an individual from the first lineup, were shown to Ms. Jobes, Ms. Hall and Western Sizzlin' waitresses, Julie Musser, Jessica Scott and Alison Posey.[1] Ten and one-half months after the robbery, or, two weeks before trial, this second lineup was also shown to Vickie and Josh Shamblin, Pam and Chris Mackey, Dale and Jeremy Davis and Vickie and Junior Marple. These individuals were in Don Emilio's Restaurant, located just behind the Western Sizzlin', when the appellant entered the restaurant and looked around just before the robbery. While Ms. Jobes, Ms. Shamblin, Ms. Scott,[2] Ms. Mackey and Jeremy Davis all identified the appellant,[3] the others were unable to identify anyone from the lineup.

One to two months after the robbery, the Parkersburg Police Department prepared a third photographic lineup of seven color photographs compiled by the sheriff's department of Washington County, Ohio.[4] The ap-

---

1. Lester Newberry, a customer at the Western Sizzlin' on the night of the robbery, was also shown this lineup.

2. Detective Miller apparently promised Ms. Scott that she would not have to testify in this case. Ms. Scott was subpoenaed as a witness, however, and testified that she was not coerced into identifying the appellant or anyone else from the photographic lineup. See n. 12, *infra*.

3. The State indicates, in its brief, that Ms. Musser was able to identify the appellant from this second lineup. However, the record is unclear as to that fact.

4. The photographs in this lineup were obviously of Washington County jail inmates. The individuals had signs on their chests with the Sheriff's Department, Marietta, Ohio printed on them, followed by identification numbers.

pellant's photograph was included in this lineup. Of those who were shown this lineup, Vickie and Josh Shamblin, Vickie and Junior Marple, Pam and Chris Mackey, Pam Jobes and Marian Hall, the appellant was identified by Ms. Shamblin, Ms. Mackey and Ms. Jobes.[5] The remaining witnesses were unable to identify anyone.[6]

Following an *in camera* hearing concerning the pretrial identification procedures, the trial court found the photographic lineups to be suggestive in that more than one lineup containing the appellant's photograph was shown to several witnesses. Thus, there was a danger that a witness who had identified the appellant in one lineup might have selected him in a subsequent lineup simply because she recognized him from the previous lineup. The trial court was further concerned with the third photographic lineup in which criminal identification numbers were shown under each photograph. The trial court, therefore, excluded the evidence of the pretrial identifications. However, the trial court found that any likelihood of misidentification from the photographic lineups did not taint the eyewitness testimony and that in-court identifications may be made without reference to the pretrial identification procedures.[7]

At trial, the appellant presented an alibi defense, testifying that he and his friend, Bill Craig, left Parkersburg between 8:30 and 9:00 p.m. on the night of the robbery, October 19, 1991. They allegedly arrived at the City Lights Tavern in Charleston, West Virginia, at approximately 10:30 p.m. After about an hour, the appellant, Mr. Craig and a man named Wade Chester went to the Charleston home of Tina Stevenson. The appellant asserted that he and Mr. Craig did not leave until the following morning, the day after the robbery of the Western Sizzlin'.

In an effort to further bolster the appellant's alibi, Mr. Craig testified that at approximately 2:30 a.m. and again at 8:30 a.m., the morning after the October 19, 1991 robbery in Parkersburg, he and Ms. Stevenson drove his van to the Orchard Manor Housing Project in Charleston to see Ms. Stevenson's cousin. There is a security gate at Orchard Manor where a security guard logs vehicles in and out of the housing project. The vehicle log reflects that Mr. Craig's van entered the housing project at 8:25 a.m. and departed at 8:29 a.m. However, the vehicle log does not corroborate the testimony that Mr. Craig and Ms. Stevenson went to the housing project earlier, at 2:30 a.m. This was explained by Ms. Stevenson, who knew the security guard on duty at 2:30 a.m., which was why he did not log in their vehicle at that time. Ms. Stevenson further testified that, when she and Mr. Craig returned to her apartment following their second trip to Orchard Manor, they parked Mr. Craig's van across the street from her apartment, in the parking lot of the Ebenezer Baptist Church. Church-

---

**5.** There is nothing in the record to explain why several witnesses were shown more than one photographic lineup which included the appellant's picture.

**6.** The record is unclear regarding subsequent photographic lineups. Apparently, Ms. Jobes was shown a fourth, and possibly fifth lineup.

**7.** The trial judge stated:

I don't think that these matters that I suggested in any way taint the original witnesses [sic] one-on-one identifications that they testified to. Most of the array business was done long after they made their statements of what they actually saw at Don Emilio's and what they actually saw at Western Sizzlin, and I see no reason that what was done in the photograph arrays would affect or cause misidentification in their courtroom testimony. Of course, I have no idea what they would say when asked if they could identify the Defendant, but I don't feel that what they did in going through anywhere from one to four arrays will affect their determination of what the person they saw on October 19th and the person that's in the courtroom.

So it's my decision that the photographic arrays are suggestive to the extent that they cause a likelihood of misidentification in the arrays, but that the same does not taint their eyewitness testimony, most of which occurred before any of the photographic arrays—it all occurred before, most of which they made reference and made statements concerning before any of the arrays were shown them, and I just can't believe that this will cause a mistaken court identification. They either will or they won't be able to identify the Defendant here in curt, which we're sure is the Defendant in this criminal trial, as the person that they testified about. And all the other things, how close they looked, how long they looked and everything that's been brought up will simply go to the weight of their identification.

goers apparently blocked in Mr. Craig's van and, consequently, the appellant and Mr. Craig could not leave Charleston until late in the morning of October 20, 1991.

Kathy Giffen, the appellant's friend and at whose apartment the appellant stored some of his belongings, testified that on October 20, 1991, the day after the robbery and the day after the appellant had allegedly gone to Charleston, the appellant asked Ms. Giffen to drive him to Charleston. Ms. Giffen drove the appellant and another individual, Teresa Kyer Craig, to Charleston and testified that, when they stopped for gasoline, the appellant purchased it from a wad of money he pulled from his pocket. This surprised Ms. Giffen, as she had never seen the appellant with a wad of money like that nor was she aware that the appellant was then employed. Ms. Giffen further testified that she had seen the appellant with a chrome-colored revolver in late October, 1991 and that, on October 20, 1991, the day after the robbery, the appellant had shaved his goatee and mustache and had cut his hair short.

## II

As indicated above, the trial judge ruled that the pretrial identification procedures were suggestive insofar as they might have caused the witnesses to misidentify the appellant in the photographic lineups. However, the trial judge found that the eyewitness testimony, most of which occurred prior to the photographic lineups, was not tainted by the pretrial photographic lineups and identification and was, therefore, admissible. Accordingly, the trial judge admitted the in-court testimony of Ms. Musser, Ms. Jobes,

Ms. Scott, Ms. Mackey and Ms. Shamblin, all of whom identified the appellant as the man who robbed the Western Sizzlin' on October 19, 1991.

Jessica Scott, a waitress at Western Sizzlin' who had finished her shift at approximately 9:30 p.m., was eating dinner in the restaurant's atrium area when she saw the appellant through the windows [8] just before the robbery. Ms. Scott saw the appellant walk by the McDonald's, located across the parking lot from the Western Sizzlin', and apparently enter it. Approximately five minutes later, Ms. Scott again saw the appellant walking towards the Western Sizzlin'.[9] The appellant walked along the sidewalk beside the atrium directly past her. Ms. Scott testified that she watched the appellant the entire time he was on the sidewalk [10] and that the appellant even looked directly at her.[11] Ms. Scott, who observed the appellant on the night of the robbery for a total of three minutes,[12] recognized him as the same person she, coincidentally, had seen walking on the street one day earlier and the morning of the robbery.[13]

Another waitress, Julia Musser, was also in the atrium area. Ms. Musser was on duty and was filling salt and pepper and sugar shakers when she noticed the appellant on the sidewalk by the restaurant, in dark sunglasses, a hat and jacket. She also noticed the appellant was wearing two gold chains around his neck. According to Ms. Musser, the appellant was looking through the glass, into the restaurant. She then watched him enter the restaurant. Ms. Musser viewed the appellant for half of a minute to a minute and a half.[14]

---

8. The walls of the atrium area are made of glass.

9. When Ms. Scott first observed the appellant, he was wearing a red T-shirt, a baseball cap and was carrying a jacket. However, when she saw the appellant walking away from the McDonald's and towards the Western Sizzlin', he was wearing a long-sleeved dress shirt.

10. Ms. Scott stated, "I have a tendency to look at blacks because I'm black[.]"

11. Ms. Scott did not see the appellant actually enter the Western Sizzlin'.

12. Ms. Scott was reluctant to testify in this case because she was familiar with the appellant's

family and because the black community in Parkersburg was so small. Apparently, Chief Miller of the Parkersburg Police Department had promised her that she would not have to testify.

13. On both occasions prior to the robbery, Ms. Scott saw the appellant's face in the daylight.

14. Ms. Musser estimated that the appellant was under six feet tall, weighing 170 to 180 pounds. At the time of his arrest, the appellant told police that he was 5'6" tall and 170 lbs. At trial, however, he testified that he was 5'5" tall and 155 to 160 pounds.

Waitress Pam Jobes was preparing to leave the Western Sizzlin' at approximately 10:30 p.m. when she observed the appellant by the cash register with the cashier, Marian Hall. As Ms. Jobes walked towards the coat rack located by the entrance, she walked past the appellant and Ms. Hall and noticed that the appellant was wearing a long sleeved dress shirt, dark slacks and was carrying a jacket over his arm. She also noticed the appellant was wearing gold chains around his neck. As Ms. Jobes was getting her coat, she heard a man's voice say "Just give it to me." Ms. Jobes then turned towards the cashier stand and walked towards Ms. Hall to help her with what Ms. Jobes believed to be a difficult customer. As she approached them, Ms. Jobes saw the barrel of a gun sticking out from underneath the jacket which was draped over the appellant's arm. Ms. Jobes then saw Ms. Hall hand over an undisclosed amount of money to the appellant, who grabbed it, turned towards Ms. Jobes and headed for the entrance. Ms. Jobes observed the appellant's face for approximately one and one-half minutes.[15]

Marian Hall, the cashier who was held up at gunpoint, testified that a black male who was waiting by the cash register and who indicated that he was waiting for his wife, pointed a gun at her and said "Don't scream." Ms. Hall handed over the money that was in the cash register. The assailant then left through the front entrance. Ms. Hall described the robber as slightly stocky in build, approximately 5'8", and wearing gold chains and an earring. At trial, Ms. Hall was unable to identify the appellant as the assailant.

On the night of the robbery, between 9:45 and 10:15 p.m., shortly before the robbery at the Western Sizzlin', Pam Mackey and Vickie Shamblin were waiting in the lobby of Don Emilio's.[16] While they were waiting to be seated, the appellant entered the restaurant and looked around. The two women noticed the appellant because they found it peculiar that he was wearing dark sunglasses at

night. Ms. Mackey testified that the appellant was wearing a ball cap, stood 5'5" or 5'6" tall and weighed 150 to 155 pounds. Ms. Shamblin described the appellant as short to medium build, wearing a ball cap and jacket. According to both Ms. Mackey and Ms. Shamblin, the appellant stopped and stood approximately six feet in front of them. They viewed the appellant for three to five minutes.

It is the appellant's contention that the witnesses' in-court identifications of the appellant were not reliable because the witnesses did not have an adequate basis, independent of the tainted out-of-court identifications, upon which to make the in-court identifications. Therefore, the appellant argues, it was error for the trial court to permit the witnesses' in-court identifications of the appellant at trial.

■ In the syllabus of *State v. Williams*, 181 W.Va. 150, 381 S.E.2d 265 (1989), we stated the following rule:

' "In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Syl. pt. 3, *State v. Casdorph*, 159 W.Va. 909, 230 S.E.2d 476 (1976).' Syllabus Point 2, *State v. Gravely*, 171 W.Va. 428, 299 S.E.2d 375 (1982).

The State maintains, and the trial court agreed, that it established an independent basis for the witnesses' in-court identification sufficient to remove any prejudice resulting

---

**15.** Ms. Jobes, who is 5'10" tall, noticed that the appellant was shorter than her and estimated his height at 5'6" to 5'8", with a stocky build.

**16.** With Ms. Mackey and Ms. Shamblin at Don Emilio's were Vickie Marple, Junior Marple, Dale Davis, Mrs. Davis, Jeremy Davis, Josh Shamblin and Chris Mackey.

from the pretrial photographic lineups under the rule enunciated in *Williams, supra.*[17] The trial witnesses gave consistent and somewhat detailed descriptions of the assailant, with no indication that their descriptions were hesitant or uncertain, after viewing him for anywhere from one to five minutes. Ms. Mackey and Ms. Shamblin viewed the assailant from only six feet away, while Ms. Scott and Ms. Musser saw him clearly through the windows of the restaurant. The assailant even stopped and looked directly at Ms. Scott, whose attention was steadily focused on him. Minutes later, Ms. Jobes came face to face with the assailant as he held up cashier Marian Hall. In view of the "totality of the circumstances," we believe the testimony of the five witnesses who identified the appellant in court was properly admitted.

### III

■ The appellant's second assignment of error is that the trial court erred in refusing to allow the introduction into evidence the inability of Marian Hall and Alison Posey to identify the appellant in pretrial identification photographs.[18] As we indicated earlier, the trial court excluded the State's pretrial photographic lineups and the testimony related thereto. The trial court further ruled that, to allow the appellant to present evidence concerning Ms. Hall's and Ms. Posey's inability to identify the appellant in pretrial photographic lineups would "open the door" to the State to introduce their evidence of pretrial identification.

'The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.' Syllabus Point 10, *State v. Huffman,* 141 W.Va. 55, 87 S.E.2d 541 (1955).

Syl. pt. 4, *State v. Ashcraft,* 172 W.Va. 640, 309 S.E.2d 600 (1983). We find that the trial court did not abuse its discretion by excluding the evidence that neither Ms. Hall nor Ms. Posey could identify the appellant in pretrial photographic lineups.

### IV

■ The appellant's final assignment of error is that the trial court erred in failing to dismiss the aggravated robbery charge because the State did not disclose exculpatory information, that is, that several people were unable to identify any person from the pretrial photographic lineups. Trial witnesses Pam Mackey and Vickie Shamblin were at Don Emilio's restaurant with seven other people.[19] Of those seven, only Jeremy Davis[20] identified the appellant in a pretrial photographic lineup. The others who were shown pretrial photographic lineups were unable to identify the appellant or anyone else as the man who entered the lobby of Don Emilio's just before the robbery of the Western Sizzlin'. It was not until the appellant cross-examined Detective Miller that he learned of this information. The appellant argues that this was exculpatory information and the State's failure to disclose it is grounds for reversal of his conviction.

'A prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution.' Syllabus Point 4, *State v. Hatfield,* 169 W.Va. 191, 286 S.E.2d 402 (1982).

Syl. pt. 4, *State v. Fortner,* 182 W.Va. 345, 387 S.E.2d 812 (1989). Not one witness or potential witness who viewed the pretrial identification lineups selected anyone other than the appellant. We do not believe that evidence of several individuals' inability to

17. This Court first adopted this rule in *State v. Casdorph,* 159 W.Va. 909, 230 S.E.2d 476 (1976), following the United States Supreme Court's decisions in *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

18. Neither Ms. Hall nor Ms. Posey was able to identify the appellant or anyone else from pretrial photographic lineups. Both Ms. Hall and

Ms. Posey were shown lineups prepared by the State while Ms. Posey was also shown lineups prepared by the appellant.

19. These seven other people are identified in n. 16, *supra.*

20. Jeremy Davis was not called as a witness at trial.

identify *anyone* from pretrial photographic lineups is exculpatory such that it would create a reasonable doubt of the appellant's guilt in this case.

Therefore, for the reasons stated above, the judgment of the Circuit Court of Wood County is affirmed.

Affirmed.

NEELY, Justice, dissenting:

(Filed July 12, 1994)

The appellant is probably guilty, but he is not guilty beyond a reasonable doubt. The fact that the appellant is a lower class black male is no reason to treat him like meat on its way to dressing and processing. Obviously the Parkersburg police woodshedded the witnesses and it was reversible error to fail to let the jury know that several key witnesses were unable to identify the appellant at pretrial photo arrays. "Totality of the circumstances" (like "sound discretion of the trial court judge") is not a talismanic phrase allowing any inherently outrageous procedure that affords conviction.