850 F.2d 693
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Willie WILSON, Petitioner-Appellant,
v.
Gene A. SCROGGY, Warden, Respondent-Appellee.
 No. 87-5834.
 United States Court of Appeals, Sixth Circuit.
 July 11, 1988.
 
 Before MILBURN, RALPH B. GUY, Jr., and ALAN E. NORRIS, Circuit Judges.
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Petitioner, Willie Wilson, appeals from the denial of his petition for a writ of habeas corpus. On appeal, as he did below, Wilson alleges four constitutional violations: (1) double jeopardy; (2) the failure to suppress certain in-court identification testimony; (3) improper arraignment proceedings; and (4) the refusal to grant a pretrial lineup.
 
 
 2
 Upon a full review of the record, we conclude that there is no merit to Wilson's claims of constitutional violations and, accordingly, we affirm.
 
 I.
 
 3
 On March 15, 1983, the defendant, along with his brother, James Wilson, and David Muncie decided to take two women acquaintances from Louisville, Kentucky, to Ft. Knox, Kentucky, for the purpose of having the women engage in acts of prostitution. It was pay day for the Army and there is a large Army installation at Ft. Knox, Kentucky. For reasons which are not clear, the three men and the two women, Yolanda Price and Teresa Cole, went instead to Bowling Green, Kentucky. In Bowling Green, they made inquiry as to where the "action" might be found and were directed to a pool hall known as the Fun Center. They were trying to find a good place to go where the women could solicit customers.
 
 
 4
 When the five of these individuals entered the Fun Center, they observed an illegal crap game in progress on the pool table with considerable sums of money in open view. They left immediately and, on the spot, conceived a plan to go back and hold up the Fun Center and take the gambling money. All three men were armed. The five returned to the Fun Center and, while the two women waited in the car, the three men entered with guns drawn and told everyone to "hit the floor." Since there were almost thirty persons in the Fun Center at that time, a wild scramble ensued. The three would-be robbers began firing away and two patrons were wounded. The three left as quickly as they came and left empty handed.
 
 
 5
 A good description of the blue Oldsmobile Toronado in which the getaway was effected was obtained and given immediately to the police. A short while later, the Oldsmobile was observed entering the freeway and a police high-speed chase followed. Although the suspects pulled away from the pursuing police car momentarily, the Oldsmobile blew its engine and had to be abandoned. All of the occupants fled into the night except Yolanda Price who concluded she had done nothing wrong and that flight was unnecessary.
 
 
 6
 When the police arrived at the abandoned car, they arrested Price and began searching the surrounding area where they found James Wilson hiding, and also one of the pistols used in the robbery. In exchange for dismissal of all charges, Yolanda Price agreed to cooperate with the police, and the four fugitives were shortly apprehended, charged, and brought to trial. Teresa Cole also decided to cooperate and testified for the government at trial.
 
 
 7
 At trial the three male defendants were identified and implicated by both Price and Cole. The defendants were also identified by many of the patrons of the Fun Center who were present at the time of the shootings and attempted robbery. Willie Wilson was convicted by the jury of criminal conspiracy to commit robbery and two counts of accomplice to second-degree assault. Wilson was sentenced to seven years on the robbery conviction and ten years on each of the assault convictions. The sentences were to run consecutively. Subsequent to conviction, Wilson exhausted his state appellate remedies and then filed this petition for habeas relief.
 
 II.
 
 8
 Although Wilson raises four issues, three of them are sufficiently interrelated that they can be discussed together. These three issues all concern the identification of Wilson. The genesis of Wilson's argument is a series of events that took place at his arraignment. Petitioner Wilson was arrested after his brother, James Wilson, was already in custody. The day set for Willie Wilson's arraignment also happened to be the date set to hear a suppression motion brought by James Wilson. Unfortunately, Willie and James were brought to court at the same time, handcuffed together. In and around the courtroom were several witnesses who were present for the suppression hearing and who later identified Willie Wilson as one of the robbers. Wilson makes three claims growing out of this inadvertent viewing. Since he had not been arraigned, he did not have appointed counsel yet, and he argues that he was thus exposed to a "lineup" without counsel. Wilson also claims that his exposure to witnesses who later made in-court identifications of him fatally tainted those identifications. His last claim in this regard is that it was error under these circumstances to deny his request for a pretrial lineup.
 
 
 9
 Although there is no shortage of case law on any of these issues, we find a review of such case law to be unnecessary to resolve these issues. Five individuals were involved in this criminal episode. Two of those involved testified for the government and made positive identifications of Wilson. One of these witnesses, Yolanda Price, had known Wilson since childhood. Although she referred to him as "Hank" rather than "Willie," we find nothing that detracts from her identification growing out of the fact that she knew him by a different name when he was a young boy. Although Wilson offered alibi evidence and sought to impeach the testimony of both Price and Cole[1] on the basis that they were not being prosecuted, this merely created jury issues and not issues of constitutional concern.
 
 
 10
 Similarly, each of the witnesses who saw Wilson at his arraignment had an independent basis for their identifications. They were all present at the Fun Center on the day of the attempted robbery and saw Wilson, not once but twice, on that day. With regard to the Fun Center incident, it is significant to note that the Fun Center was a kind of neighborhood "club" that got a steady repeat group of customers all of whom knew each other. Since illegal gambling went on, the presence of strangers did not go unnoticed. On the day in question, when these five "strangers" walked into the Fun Center, it was the kind of incident that resulted in more than just a casual glance being directed at them.
 
 
 11
 On the issue of tainted identifications, the Supreme Court stated:
 
 
 12
 It is, first of all, apparent that the primary evil to be avoided is "a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. , at 384.... It is the likelihood of misidentification that violates a defendant's right to due process....
 
 
 13
 Neil v. Biggers, 409 U.S. 188, 198 (1972).
 
 
 14
 Wilson made no attempt to hide or disguise his appearance at the Fun Center. The trial was held a relatively short time after the crimes were committed. Under such circumstances, we find no substantial likelihood of misidentification.
 
 
 15
 Since we conclude that Wilson was not prejudiced by the fact that witnesses saw him at the arraignment, we also conclude that the fact he did not yet have counsel appointed is of no significance.
 
 
 16
 Although, as earlier indicated, Wilson made no attempt to disguise or hide his appearance during the attempted robbery, he did shave his head immediately prior to trial in an effort to change his appearance. Because of this, the trial judge properly exercised his discretion to deny Wilson's request for a pretrial lineup. The matter of pretrial lineups is traditionally one left to the sound discretion of the trial judge. Moore v. Illinois, 434 U.S. 220 (1977).
 
 III.
 
 17
 Wilson's argument on the double jeopardy issue grows out of the fact that he was convicted of both conspiracy to commit first-degree robbery and accomplice to second-degree assault. Wilson now maintains that the prosecutor relied upon the same evidence of physical injury to innocent bystanders as proof of an element of both offenses and that therefore his constitutional right not to be twice placed in jeopardy for the same act was violated.
 
 
 18
 Under Kentucky law, in order to be guilty of robbery in the first degree, force or the threat of force must be involved. Ky.Rev.Stat. Sec. 515.020(1). Wilson argues that the "force" involved here was the shooting of the two patrons. Since the "force" was an element of first-degree robbery, Wilson claims that he could not then be separately convicted and sentenced for the assaults. We disagree as did the Kentucky Supreme Court which also considered and rejected this argument. Wilson v. Commonwealth, 695 S.W.2d 854 (Ky.1985).
 
 
 19
 The test for determining whether offenses are the same for double jeopardy purposes requires review of the statutory provisions involved to determine "whether each provision requires proof of a fact which the other does not." Brown v. Ohio, 432 U.S. 161 (1977). In Illinois v. Vitale, 447 U.S. 410, 419 (1980), it was held that two offenses are not the same, and thus separate prosecutions are not barred, unless one offense "is always a necessary element" of the other or, under the facts of the case, it is necessary for the prosecution to prove all elements of the lesser offense as an element of the greater offense.
 
 
 20
 Under Kentucky law, first-degree robbery is defined as follows:
 
 
 21
 (1) A person is guilty of robbery in the first degree when, in the course of committing theft, he uses or threatens the immediate use of physical force upon another person with intent to accomplish theft and when he:
 
 
 22
 (a) Causes physical injury to any person who is not a participant in the crime; or
 
 
 23
 (b) Is armed with a deadly weapon; or
 
 
 24
 (c) Uses or threatens the immediate use of a dangerous instrument upon any person who is not a participant in the crime.
 
 
 25
 Ky.Rev.Stat. Sec. 515.020(1).
 
 
 26
 Second-degree assault is defined as follows:
 
 
 27
 (1) A person is guilty of assault in the second degree when:
 
 
 28
 (a) He intentionally causes serious physical injury to another person; or
 
 
 29
 (b) He intentionally causes physical injury to another person by means of a deadly weapon or a dangerous instrument; or
 
 
 30
 (c) He wantonly causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument.
 
 
 31
 Ky.Rev.Stat. Sec. 508.020(1).
 
 
 32
 When these two sections are read in conjunction, it is clear that second-degree assault requires that a "serious physical injury" result or that a physical injury result from the use of a deadly weapon or dangerous instrument. These clearly are not required elements of first-degree robbery. If Wilson had been convicted of the degree of assault that only required that the victim be put in fear, he might have a double jeopardy argument. But where two persons are actually shot in the course of a robbery, this type of serious physical injury can be prosecuted and punished separately from the robbery without implicating double jeopardy.
 
 
 33
 AFFIRMED.
 
 
 
 [1]
 James Wilson also refused to acknowledge that his brother, Willie, was one of the group