## A94A0484. LAMPKIN v. THE STATE.
(445 SE2d 324)

McMURRAY, Presiding Judge.

Defendant was tried before a jury and convicted of robbery by intimidation. A hearing was conducted immediately before trial on defendant's motion to suppress the testimony of Suzanne Raborn, the only eyewitness who identified defendant as perpetrator of the crime charged. Investigator Charles Reid Crider of the Columbia County Sheriff's Office then testified that Ms. Raborn identified defendant in a photo line-up as perpetrator of the crime charged. Defense counsel argued that the photo line-up was impermissibly suggestive and that, during the calendar call two days before trial, the State's attorney "took [Ms. Raborn] back into the lock-up without my presence violating [defendant's] constitutional rights and . . . totally tainted the identification of my client. . . ." The trial court then made the following inquiry:

"THE COURT: [What] explanation do you have for that kind of conduct? [STATE'S ATTORNEY]: Yes, sir. First of all, I think I did violate a constitutional right, but I wouldn't say I violated all of his constitutional rights. I called [defense counsel] yesterday and apologized. I was not aware that . . . the law was that the defense attorney was entitled to be present after indictment. I am now aware of that. I informed [defense counsel] at that time I was not even going to go into that line-up. I had never planned to ask on the stand if she had seen him Monday back in lock-up as a second line-up. I was not even going to say that and I told [defense counsel] that at that time. That's not even at issue here. I understand I cannot use that, although if [defense counsel] had been back there it certainly would have helped my case. . . . I would say for the record there were four black males in the lock-up area. They were all seated, none of them were standing. We did not go into the room. [Ms. Raborn] merely walked past the doorway. She had indicated to me, asked me if the defendant was going to be in court and I told her I thought he would and then when he never walked out, I said, 'Do you want to go back there?' and she said, 'Yes.'" The trial court denied defendant's motion to suppress, but later granted defendant a new trial.

Defendant filed another motion to suppress the testimony of Suzanne Raborn, asserting the same argument raised at the earlier motion to suppress hearing at defendant's first trial. The trial court denied this motion and the case proceeded to the new trial. Dawn

Michelle Davis then testified that a black man wearing a stocking mask came into her place of employment, Silverstein's Cleaners, at about 4:45 in the afternoon on July 20, 1991, "threw a white Hardee's bag at [Davis] and told [her] to fill it up with money and [that] if [she] did anything he would shoot [her]." Davis testified that she put about $200 in the white bag and that the masked man then "came from behind [her], took the money from [her] and told [her] to lay down on the floor, not to move, not to do anything; if [she] did he would blow [her] head off." Davis testified that she complied; that the robber fled and that she summoned law enforcement authorities.

Suzanne Elaine Raborn testified that she was working in her floral shop near Silverstein's Cleaners during the afternoon of July 20, 1991, and that she witnessed defendant pacing outside her store immediately before the robbery. Specifically, Ms. Raborn testified as follows: "Okay, it was about 4:30 in the afternoon. The reason I remember the time is because my daughter was sixteen at the time and she had a part-time job at Kroger as cashier and . . . her shift started that afternoon at 4:15. She had just left the store. We closed the shop earlier that day because we usually stayed open on Saturday til noon or a little later. And I worked in the shop that afternoon because she had a later shift. I was standing at my work table at this time and noticed out of the corner of my eye someone walking down the walkway outside the front door. I looked up to see who it was or where they were going because it was unusual that time in the afternoon for someone to be on that end of the shopping center because we were closed, unless they were going to Silverstein's. . . . The person came to the front door and stopped, but they were not facing the front door. . . . They stopped and my initial impression was that they were going to knock on the door, wanted something from the shop, but they didn't . . . he didn't. Q. What was the general description of this person who was stopped outside your window? A. It was a male, black skin, medium tone complexion; he was about, I would say he was between 5′11″ and 6′1″. He was standing at the door, but then he began to pace to the right side and then to the left side. I realized then that he was either waiting for someone or he wasn't just standing there. The longer he stayed the more antsy he became. He would look down towards Kroger and then he would turn and look to the left hand side, Silverstein's way, which is right at the end of the walk way. At that point I became suspicious of him so I walked up towards the front of the shop. I had an old piano that was stripped down and I had it like a desk and I used it for a display. I stood to the right of the piano kind of crouched down where I could not be seen because I just wanted to watch him. And he stood . . . continued to kind of watch and walk back and forth as if he was waiting or upset because someone had not picked him up, but at this point he was getting more

upset or more antsy. Q. How far were you from him when you moved to the front of the store? A. Okay, the piano was located about fifteen feet from the front glasses. . . . Q. Okay, what were the lighting conditions in this store and immediately outside . . . ? A. It was very bright light. It was very hot, sunshiny afternoon so you could easily see outside. . . . Q. Okay. All right, what else did you notice about this individual's behavior at this point? A. When I got up to the piano he was still pacing sort of to the right and then to the left. Then he walked over to the left of my front door, which was in front of another display that I had. At that point he stopped and turned and faced towards the end of the walk way, which would make his left side to the front of my store. At that point I walked from the piano over behind a screen that I used behind an old mantle piece as a display. It was an oriental screen; it was not opened completely stretched out. I had it kind of an accordion . . . kind of in the shape of a 'w.' I could stand behind it an [sic] look between the hinged cracks and watch him. I would say then I was probably about eight feet from him at that point. . . . [O]ne of the things that made him seem suspicious to me was that he had a small white Hardee's paper bag in his left hand. He was just holding on to the top of it. Because of the light shining through it you could tell there was nothing in it. But, it was a very small bag and he continued the entire time to hold this into his left hand. . . . At the point that he went in front of the left side of my store and stopped he was holding the small paper bag in his left hand, but he looked down towards his right pocket and with his left hand he went over to his right pocket and kind of went over as if trying to get something out of his right pocket. I could not see his right pocket at that time because he had turned like this and I was over here. He reached into his right pocket and pulled out a stocking, which was a ladies hosiery, where it had been cut off and tied and he went with both hands and pulled it over his face. And at that point, immediately, as soon as the stocking started coming over his face he ran next door to Silverstein's. Q. Okay, before he put the stocking over his face were you able to get a look at him, a look at his face? A. He never turned and faced me like you are facing me now, but I saw three quarters of both sides of his face. . . . Q. Okay, and what did his face look like, was there anything unusual about him? A. There was no facial hair. Hair was very short, very clean cut, medium tone skin. . . . Q. How long was this individual standing outside your store for? A. I would say about two and a half minutes, three minutes maximum. . . . Okay, did you remember what he looked like? A. Yes, I do. Q. Okay, do you remember August 6, 1991, some investigators coming to your store to show you some pictures? A. Yes, I do. Q. Okay, I'm going to show you State's exhibit number six and ask you if you recognize this exhibit[,] are these the pictures that you were

shown on August 6, 1991? A. Yes, they are. . . . Q. [Were] you able to make [an] identification, pick one of these pictures out as the man you had seen that afternoon? A. Yes, I did[, number] five. Q. . . . Ms. [Raborn] did you hesitate in any way or were you unsure at all that the man pictured in number five was the man that was outside your store that afternoon? A. No, I wasn't. Q. Ms. [Raborn], the man that was pacing outside your store that afternoon is he present in the courtroom today? A. Yes, he is. Q. Can you please identify him? A. Yes, it's the individual right there. [STATE'S ATTORNEY]: Let the record reflect she has identified the Defendant."

The jury found defendant guilty of robbery by intimidation. This appeal followed the denial of defendant's motion for new trial. *Held*:

1. In his first and second enumerations, defendant contends the trial court erred in allowing Ms. Raborn to testify at trial in light of the unconstitutional and impermissibly suggestive pretrial identification procedures. These enumerations are without merit. See *Jacobs v. State*, 207 Ga. App. 714 (1) (429 SE2d 256).

"Pretermitting whether the pretrial photographic and [showup procedures] to which [Ms. Raborn] was subjected was unduly permissive (see generally *State v. Frye*, 205 Ga. App. 508, 509 (2) (422 SE2d 915))[, the controlling issue] is whether any procedure resulted 'in a very substantial likelihood of irreparable misidentification.' The factors to be considered in evaluating whether a very substantial likelihood of irreparable misidentification exists, under the totality of the circumstances include: '(a) the opportunity of the witness to view the criminal at the time of the crime, (b) the witness' degree of attention, (c) the accuracy of the witness' prior description of the criminal, (d) the level of certainty demonstrated by the witness at the confrontation, and (e) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U. S. 188 (93 SC 375, 34 LE2d 401).' (Punctuation omitted.) *Phillips v. State*, 204 Ga. App. 698 (2) (420 SE2d 316)." *Montgomery v. State*, 210 Ga. App. 147, 148 (3a) (435 SE2d 510).

In the case sub judice, Ms. Raborn's testimony reveals that she had ample opportunity to view the man who masked himself just before entering Silverstein's Cleaners on July 20, 1991; that her degree of attention was focused because of the man's suspicious behavior; that her physical description of defendant was specific at the time of the initial police investigation; that she was certain of her identification of defendant at the photographic line-up and that the photographic line-up was conducted three weeks after commission of the crime charged, "a reasonable cooling-off period but not so long as to impair her memory." *Montgomery v. State*, 210 Ga. App. 147, 148 (3a), 149, supra. Further, the degree of detail Ms. Raborn gave at trial regarding the sequence of events before defendant's appearance at

the crime scene bolsters the reliability of her identification of defendant as the perpetrator of the crime charged. Consequently, since there existed no substantial likelihood of irreparable misidentification due to the pretrial identification procedures used in the case sub judice, the trial court did not abuse its discretion denying defendant's motion to suppress and in allowing Ms. Raborn's testimony at trial.

2. In his final enumeration, defendant contends the evidence was insufficient to support the jury's verdict. This contention is without merit. Dawn Michelle Davis's testimony regarding the perpetrator's threats and intimidation during the robbery of Silverstein's Cleaners on July 20, 1991, and Suzanne Elaine Raborn's testimony regarding defendant's activities outside Silverstein's Cleaners just before the robbery supports the jury's finding that defendant is guilty, beyond a reasonable doubt, of robbery by intimidation as charged in the indictment. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560); *Hogan v. State*, 210 Ga. App. 122 (1), 123 (435 SE2d 494).

*Judgment affirmed. Pope, C. J., and Smith, J., concur.*

DECIDED JUNE 7, 1994 —
RECONSIDERATION DENIED JUNE 22, 1994.

*Samuel W. Cruse*, for appellant.
*Daniel J. Craig, District Attorney, Charles R. Sheppard, Assistant District Attorney*, for appellee.