OPINION
Defendant-appellant Arthur Leroy appeals from his conviction and sentence on four counts of Aggravated Robbery, one count of Felonious Assault, one count of Attempted Aggravated Robbery, and two counts of Having Weapons While Under Disability. Leroy contends that the trial court erred by denying his motion to suppress evidence obtained as the result of an allegedly unduly suggestive show-up, and that the trial court erred in imposing maximum, consecutive sentences.
We conclude that even if the trial court erred in denying the motion to suppress, that error was harmless in view of the fact that the only eyewitness who might have been influenced by the allegedly unduly suggestive show-up procedure did not positively identify the defendant, but merely indicated that he had the same "build" as the perpetrator. We do agree with Leroy, however, that the trial court erred by imposing maximum, consecutive sentences without providing a sufficient explanation of its reasons therefor, as required by R.C. 2929.19(B)(2). Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for re-sentencing.
 I
Both of Leroy's convictions for Having Weapons While Under Disability included prior offense of violence specifications. All of Leroy's other convictions, which include four Aggravated Robbery convictions, one Felonious Assault conviction and one Attempted Aggravated Robbery conviction, include three-year firearm specifications.
The charges against Leroy arise out of two separate incidents. One of these was the robbery of Rosalyn Taylor-Tompkins, at gunpoint, while she was sitting in her stopped car. Taylor-Tompkins picked Leroy's photograph out of a photo spread, and positively identified him at trial.
The other incident, which occurred the following day, involved a masked man robbing the Ardmore Cleaners, and two individuals who were present, at gunpoint. The owner of Ardmore Cleaners, John Gates, came around the side of the building toward the front of the establishment, while the robbery was in process. Gates had armed himself, and gun fire was exchanged, with the robber fleeing the store. Gates was wounded, and believed that the perpetrator had been wounded, as well. The perpetrator wore a mask. None of the persons present in the Ardmore Cleaners, including Gates, was able to identify the perpetrator.
Cecil White, Jr., was driving by the Ardmore Cleaners at the time of the robbery. White saw a masked person, evidently the perpetrator, run to a house that was catty-corner across the intersection from the Ardmore Cleaners, and attempt unsuccessfully to enter a window. Traffic required White to move, but he saw a basement window open, and called 9-1-1.
A number of police officers responded. While they were investigating, Leroy emerged from the house into which it was believed the perpetrator had fled. When a police officer asked Leroy if anyone was inside the house, Leroy replied, "No. I live there alone." Leroy gave the police permission to enter the home in order to determine if anyone was hiding inside the house. The police conducted a limited search of the house to determine whether anyone else was there. They found no one else, but saw a gun on a night stand, in plain view, in one of the home's bedrooms.
At the scene, White was not able to positively identify Leroy as the person he had seen fleeing from Ardmore Cleaners, "because I didn't ever see his face," but did indicate that based upon Leroy's build, White could say that Leroy looked like the perpetrator.
Leroy was taken to the police station for questioning. While he was being questioned, one of the police officers noticed blood on his sweatshirt, which appeared to be fresh. The police seized the sweatshirt as evidence. When the sweatshirt was removed, a police detective observed what he concluded to be a wound in Leroy's right arm. One officer, based upon his experience, opined that this was a gunshot wound, including both an entrance wound and an exit wound.
Police obtained a search warrant for Leroy's home. Inside the home, police officers found two black purses belonging to the clerks at Ardmore Cleaners, a zippered vinyl pouch with money inside, a green trench coat with two bullet holes in the right sleeve, and various types of ammunition fitting both one of the perpetrator's guns that had been found at Ardmore Cleaners, and a gun that was found in Leroy's home.Leroy denied any knowledge of the gun or purses, but indicated that two persons, whose names he did not know, had recently stayed at his house.
Following his indictment on the charges of which he was ultimately convicted, Leroy moved to suppress evidence, contending, among other things, that eyewitness identification evidence had been obtained as a result of an unduly suggestive show-up procedure in the vicinity of Ardmore Cleaners. Following a hearing, this motion was denied.
A jury found Leroy guilty of all charges and specifications.
The trial court merged the firearm specifications relating to the Ardmore Cleaners robbery, and imposed a term of three years on these merged specifications. The trial court also imposed a three-year sentence on the firearm specification relating to the robbery of Taylor-Tompkins, to be served consecutively. The trial court imposed four ten-year sentences on each of the Aggravated Robbery convictions, to be served consecutively, and the trial court imposed an eight-year sentence on the Attempted Aggravated Robbery conviction, to be served consecutively.
The trial court imposed an eight-year sentence on the Felonious Assault conviction, to be served concurrently, and twelve-month sentences on each of the Having Weapons While Under Disability convictions, to be served concurrently. The total term of incarceration imposed by the trial court amounted to fifty-four years, consisting of the four ten-year Aggravated Robbery sentences, the one eight-year Attempted Aggravated Robbery sentence, and the two three-year firearm specifications, all of which were imposed consecutively.
From his conviction and sentence, Leroy appeals.
 II
Leroy's First Assignment of Error is as follows:
 "THE TRIAL COURT ERRED IN IMPOSING MAXIMUM CONSECUTIVE SENTENCES FOR FOUR COUNTS OF AGGRAVATED ROBBERY AND ONE COUNT OF ATTEMPTED AGGRAVATED ROBBERY."
As Leroy and the State both recognize, the imposition of consecutive sentences exceeding the maximum sentence that could be imposed for any one of the convictions requires certain findings. R.C. 2929.14(E)(4):
 "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 "(a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 "(b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 "(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
Similar, but not identical, findings are required for the imposition of a maximum sentence, pursuant to R.C. 2929.14(C).
In addition to the findings required by statute, when a trial court is imposing consecutive sentences or a maximum sentence, it is required to give its reasons for imposing the consecutive sentences or the maximum sentence. R.C. 2929.19(B)(2) (c) and (d). State v. Martin (December 28, 2001), Montgomery App. No. 18652.
In the case before us, the termination entry includes neither the findings nor the reasons required by statute. The transcript of the sentencing hearing includes only the following statement by the court material to the statutory requirement of findings and reasons:
 "In addition, the Court wants noted for the record that the consecutive sentences are necessary for the protection of the public from future crime, also due to, as I stated, the seriousness of the nature of your conduct and the danger that you posed to the public, having been convicted or pled guilty several other times. In this case there were multiple offenses, so that means that a single prison term for any one of the offenses committed would not adequately reflect the seriousness of your conduct."
The State argues that the above-quoted comment satisfies both the statutory requirements of findings and reasons. In our view, the above-quoted statement by the trial court at the sentencing hearing may satisfy the findings requirement, but does not satisfy the additional requirement of R.C. 2929.19(B)(2), that the trial court give its reasons for the sentence. The only thing in the trial court's statement that goes beyond the bare findings required by the statute is the trial court's reference to Leroy's "having been convicted or pled guilty several other times." The trial court does not indicate when these other offenses occurred, or what they were. In our view, this fleeting reference does not satisfy the requirements for R.C. 2929.19(B)(2).
Leroy's First Assignment of Error is sustained.
 III
Leroy's Second Assignment of Error is as follows:
 "THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS CONCERNING THE IDENTIFICATION OF APPELLANT AT ARDMORE CLEANERS."
Leroy argues that the totality of the circumstances pertaining in the vicinity of Ardmore Cleaners shortly after the robbery, "with people yelling out that appellant was the robber," made the show-up identification procedure so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification, citing Neil v. Biggers
(1972), 409 U.S. 188.
The State argues that it is not clear who, beside White, himself, was "yelling out that [Leroy] was the robber." The State also argues that even if the trial court erred in denying Leroy's motion to suppress the identification evidence, that error is harmless in view of the fact that no witness involved in the Ardmore Cleaners robbery identified Leroy as the perpetrator.
All of the witnesses at the Ardmore Cleaners robbery indicated that the perpetrator was wearing a mask. With the possible exception of Cecil White, all of the witnesses indicated that they could not identify the perpetrator. White's testimony at trial on this subject is worth setting forth in full:
"Q. And what happened when you got back to the cleaners?
 "A. Well, the police officer had came, maybe three or four had came, and I told him that the guy that the guy [sic] was struggling with was in that house over there across the street.
"Q. And what happened then?
 "A. The policeman put me in the car sitting right in front of the cleaners because he had pulled it right in front of the cleaners, and he was asking me some questions and stuff, but then when I walked over, I seen them walking a gentleman. I guess he came out [sic] the house. I didn't see him come out [sic] the house, but there was police cars in the alley, and they took him and put him in the car.
"Q. Okay.
 "A. Okay. And the police walked me over there and asked me was this the guy. I said the build looks like the guy, the build of him, because I didn't ever see his face, but I said that looked like the guy.
"Q. Had you seen anyone come out of the house?
"A. No.
 "Q. Do you recall telling the officers what the person you saw who had run catty-corner looked like or what they were wearing?
"A. Yeah, yes.
"Q. Would you describe that for us?
"A. A black hooded sweatshirt, mask, long cream jacket.
 "Q. Okay. A hooded sweatshirt, you said. Like this (indicating)?
"A. Yeah.
 "Q. You called it a cream jacket. Did it look like this (indicating)?
 "A. Yeah, that's the jacket, yeah. I might have got the color mixed up. It was a long trench jacket.
 "Q. Okay. And that person was the one you describe as going catty-corner across Third?
"A. Uhm-hmm.
"Q. Now, you said you didn't get to see his face?
"A. No.
 "Q. So based solely on what you saw prior to when you were walked over to the cruiser, prior to that, so only what you saw until you lost the person at the house, based solely —
"A. The one that they showed me in the car?
 "Q. No, no, not the person they showed you in the car. We kind of have to separate this.
"A. Okay.
 "Q. Based only on what you saw till the time you called 911, would you be able to identify that person that you saw?
"A. I can't identify his face.
"Q. Okay.
"A. Just what he had on and what I said."
We agree with the State that White never definitely identified Leroy as the perpetrator; he merely indicated that, based on Leroy's build, Leroy looked like the perpetrator. In our view, the jury would not have understood White's testimony as asserting that Leroy was, in fact, the perpetrator, but merely that Leroy's build was similar to the perpetrator's build. Accordingly, even if the trial court erred by denying Leroy's motion to suppress identification testimony, upon the ground that it was based upon an unduly suggestive show-up procedure at the scene, that error is harmless, because White did not identify Leroy as the perpetrator. See, State v. Reddish (October 15, 1999), Montgomery App. No. 17323.
Leroy's Second Assignment of Error is overruled.
 IV
Leroy's First Assignment of Error having been sustained, and his Second Assignment of Error having been overruled, the judgment of the trial court is Reversed, and this cause is Remanded for re-sentencing. Upon remand:
 "The trial court should first reexamine the evidence presented in this case and then impose appropriate sentences for all counts by applying the correct statutory factors, making the necessary findings, and expressly stating its reasons for imposing such sentences on the record. The trial court should not simply make a finding on the record to support the imposition of its original maximum and consecutive sentences . . . instead, the trial court needs to redetermine what the appropriate sentences for all counts should be and then state its reasoning for such conclusion on the record. We do not mean to suggest, however, that the trial court is precluded from reimposing the original sentences if, upon proper analysis, it remains convinced that they are appropriate." State v. Martin (December 28, 2001), Montgomery App. No. 18652, quoting State v. Johnson
(May 11, 2001), Montgomery App. No. 18383.
BROGAN and GRADY, JJ., concur.