794 So.2d 1039 (2001)
Garth WINGATE, Jr., Appellant,
v.
STATE of Mississippi, Appellee.
No. 1999-KA-00608-COA.
Court of Appeals of Mississippi.
February 20, 2001.
Rehearing Denied June 19, 2001.
Certiorari Denied September 20, 2001.
*1040 Dan W. Duggan, Jr., Brandon, Vicki Lachney Gilliam, Jackson, Attorneys for Appellant.
Office of the Attorney General by Billy L. Gore, Attorneys for Appellee.
Before McMILLIN, C.J., BRIDGES, and MYERS, JJ.
BRIDGES, J., for the Court:
¶ 1. Garth Allen Wingate, Jr. was convicted on one count of robbery and one count of aggravated assault in the Rankin County Circuit Court. Wingate appeals, alleging the following errors in the court below:

*1041 I. THE TRIAL COURT ERRED BY FAILING TO SUPPRESS BOTH THE OUT-OF-COURT IDENTIFICATION OF WINGATE BY STEVERSON AND THE SUBSEQUENT IN COURT IDENTIFICATION BECAUSE THE PRIOR SUGGESTIVE AND IMPROPER PHOTO LINE-UP WAS SO IMPERMISSIBLY SUGGESTIVE THAT IT GAVE RISE TO A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION; AND
II. THE VERDICT WAS AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE.
Finding no error, we affirm.

FACTS
¶ 2. Seventy-five year old Laurine Steverson admitted a wet, muddy, and shivering Garth Allen Wingate, Jr. into her home between 7:00 a.m. and 8:00 a.m. on January 18, 1995. Steverson knew Wingate because his father helped her do odd jobs around her home and his aunt lived two doors down from her. Wingate told Steverson that he had fallen in a ditch, and he asked if he could come in and dry off. Steverson invited Wingate inside and allowed him to dry off by her heater. Wingate left when Steverson's home health aide, who was present during this early morning visit, told Wingate it was time for Steverson's bath. Steverson lived alone, but she had a home health aide over every morning to check on her.
¶ 3. At around lunch time on the same day, Steverson was physically assaulted and robbed in her home. Her home health aide had gone by that time, so Steverson was alone. Her assailant punched her in the nose, bound her hands, knees, and ankles with duct tape, gagged her with a sock secured by duct tape, and dragged her from the living room to the bedroom. Steverson was discovered at about 5:00 p.m. by neighbors. Steverson suffered a broken shoulder, broken ribs, and various abrasions and bruises which required her hospitalization for eight days. Steverson identified her assailant as "Garth Allen Wingate, Jr." to the police officer who arrived on the scene.
¶ 4. Steverson testified that she allowed Wingate into her home the second time because he told her that he had been locked out of his mother's and father's home. He asked Steverson if he could come in and sit by her fire. When asked why he did not go to his aunt's home just two doors down, Wingate told Steverson that his aunt talked too much. Steverson admitted Wingate into her home and went to get him a glass of water which he requested. After Wingate drank half of the glass of water, he punched Steverson in the nose and began gagging her and taping her.
¶ 5. When Steverson returned home after her hospitalization, she discovered that $360 was missing from a Sunburst Bank envelope which she kept under her mattress. Also, $40 was missing from her wallet. Steverson was the only one who knew that she kept a bank envelope containing cash under her mattress. A fingerprint analysis of the bank envelope, performed by a scientist at the Mississippi Crime Lab, revealed two fingerprints matching Wingate's left ring-finger. Steverson testified that Wingate had never been in her bedroom before the day he assaulted her and did not previously have access to the envelope.
¶ 6. About three weeks after the assault and robbery, Don Manning, a detective at the Pearl Police Department, showed Steverson a page containing six photographs. The photographic line-up included a photograph of Wingate along with photographs of five other white males. Detective Manning *1042 instructed Steverson to study the photographs and determine which, if any, was her assailant. After about two or three minutes, Steverson selected Wingate's photograph from the line-up. Wingate was arrested shortly thereafter.
¶ 7. Wingate admitted to the police that he had visited Steverson on the morning of the day that she was assaulted. Afterwards, Wingate claimed that he walked to his father's house. Discovering that his father was not home, Wingate walked ten miles to Capital Beer Service, a bar on Porter Street, near Gallatin Street, in Jackson. Wingate told Detective Manning that he arrived at the bar at around 10:00 a.m. and remained there all day. He further claimed that he spent the night in a friend's car in the bar's back parking lot. Wingate did not testify at trial.

LAW AND ANALYSIS

I. DID THE TRIAL COURT ERR BY FAILING TO SUPPRESS BOTH THE OUT OF COURT IDENTIFICATION OF WINGATE AND THE IN COURT IDENTIFICATION?
¶ 8. The standard of review for suppression hearing findings in pre-trial identification cases follows:
The combined effect of the circuit court's pre-trial and trial rulings is that of a finding of fact that, under the totality of the circumstances ... in-court identification testimony had not been impermissibly tainted. We may, of course, disturb such a finding only where there is an absence of substantial credible evidence supporting it.
Magee v. State, 542 So.2d 228, 231 (Miss. 1989).
¶ 9. Wingate believes that the photographic line-up was impermissibly suggestive and that it tainted Steverson's in-court identification of him as the perpetrator of the crimes against her. He argues that he was the only person in the line-up whose height was clearly depicted at over six feet and the only one with blond hair. Further, Wingate claims he looks heavier and older than the others. The trial court denied Wingate's motion to suppress the line-up and allowed Steverson to make an in-court identification of Wingate. The trial court further allowed Detective Manning to testify that after Steverson viewed the photographic line-up, she identified Wingate as her assailant. To determine whether the trial court's findings were supported by substantial evidence, we turn to a discussion of the law which governs pre-trial and post-trial identifications.
¶ 10. A photographic line-up is impermissibly suggestive when the accused is "conspicuously singled out in some manner from others...." York v. State, 413 So.2d 1372, 1383 (Miss.1982). "An impermissibly suggestive pre-trial identification does not preclude an in-court identification by an eye-witness who viewed the suspect at the procedure, unless: (1) from the totality of the circumstances surrounding it (2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id. The standard is the same, with the omission of the word "irreparable," even where testimony regarding the out-of-court identification itself is proffered. Id.
¶ 11. Since testimony was elicited regarding Steverson's out-of-court identification, the trial court was charged with determining whether from the totality of the circumstances surrounding the photographic line-up, the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification. To determine whether this standard was fulfilled, the we consider the *1043 factors enumerated in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). They are:
[T]he opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.
Id. at 199.
¶ 12. Steverson had ample opportunity to view the criminal at the time of the crime. She had seen Wingate earlier that day and had observed that he was wet, muddy, and cold. She brought him a glass of water during his second visit and watched him drink half of it before he punched her in the nose. Steverson's opportunity to view her assailant and her degree of attention were excellent. Steverson identified her assailant by name and described him to Detective Manning as a clean-shaven white man who was about six feet tall, who weighed about 160 to 165 pounds, who had sandy blond hair, and who was in about his late twenties. This description, given prior to the line-up, was extremely accurate.
¶ 13. Steverson's level of certainty that Wingate was her assailant was unwavering at both the pre-trial and the in-court identifications. About two minutes after carefully viewing the photographic line-up, she identified Wingate. Detective Manning confirmed that Steverson expressed no doubt that the man depicted in the second photograph, Wingate, was her assailant.
¶ 14. In court, Steverson was asked if her assailant was present in the courtroom. After standing in the witness box and looking around she responded: "I think it's him. But it's not likehe don't look like he did when Iwhen he attacked me." Steverson explained that at the time of the attack, Wingate was slender and blond. Wingate was ordered to approach the witness stand so Steverson could get a closer look at him. When he approached, Steverson responded: "That's him." She then stated that she was sure after seeing him up close.
¶ 15. Steverson's initial hesitation in recognizing Wingate is understandable given that Wingate's physical appearance was different at trial than it was on the day the crimes were committed. On the day the crimes occurred, Wingate had sandy blond hair and he was clean-shaven. At the time of trial, Wingate had dark hair and a mustache. Even Wingate's aunt, Frances Moore, hesitated before recognizing her own nephew in the courtroom. When asked if she saw Wingate in court, Moore responded: "I don't see nobody looks like him." Moore was finally able to point Wingate out; she attributed her hesitation in identifying her nephew to the fact that his appearance had changed. Steverson's level of certainty that her assailant was Wingate never wavered. Once she saw past the changed hair and the new mustache, Steverson was certain that Wingate was her assailant.
¶ 16. Finally, Steverson identified Wingate in the photographic line-up approximately three weeks after the crimes perpetrated against her. It is unlikely that her memory dimmed during such a short length of time.
¶ 17. All of the Biggers factors indicate that the pre-trial identification procedure did not give rise to a substantial likelihood of misidentification. Wingate was not conspicuously singled out in the photographic line-up. Even if he was, Steverson did not rely upon the line-up in making her incourt identification. She was personally acquainted with Wingate, and she had seen him earlier on the day that she was assaulted *1044 and robbed. Steverson took a good look at Wingate at trial and again identified him, not relying upon the photograph that she had previously seen, but relying upon her memory of the way Wingate looked at the time of the attack. This substantial, credible evidence supports the trial court's decision to admit the identifications; thus, we are not at liberty to disturb the trial court's refusal to suppress the identifications.

II. WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?
¶ 18. Wingate offered three alibi witnesses. His father, Garth Allen Wingate, Sr., testified that he drove his son to the Capital Beer Service at about 10:30 a.m. that day and dropped him off. Wingate, Sr. drove by the bar again at about 11:30 to 11:45 a.m. and saw that his son was still there and that he was working on a car behind the bar. Jimmy Dorris testified that he saw Wingate working on a car behind the Capital Beer Service between 12:00 to 2:00 p.m. He admitted on crossexamination that he did not remember the exact date that he saw Wingate. He simply knew that he saw Wingate behind the bar in January of 1995.
¶ 19. Sharelle Shoemaker, a longtime friend of Wingate and Wingate's family, testified that she saw Wingate walking down Gallatin Street at about 2:00 p.m. in January 1995. Shoemaker testified that she remembered seeing Wingate on Gallatin Street on the day the crimes were committed because that was the day before Wingate was arrested. According to Shoemaker, hearing about Wingate's arrest made an impression on her which triggered her memory of seeing him on the preceding day. On cross-examination, Shoemaker stated that she did not know that Wingate was arrested in February, three weeks after the crimes were committed, and not on the day following the commission of the crimes.
¶ 20. Wingate argues that given the above alibi evidence, he could not possibly have perpetrated the crimes against Steverson. Thus, according to Wingate, the jury's verdict of guilt was against the overwhelming weight of the evidence.
¶ 21. An argument that the verdict was against the overwhelming weight of the evidence is challenged in a motion for new trial. The decision to grant or deny such motion is discretionary with the trial court. McClain v. State, 625 So.2d 774, 781 (Miss.1993). The trial court should grant a new trial motion only when the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would be to sanction an unconscionable injustice. Wetz v. State, 503 So.2d 803, 812 (Miss.1987). In reviewing the trial court's denial of a new trial motion, we must accept as true all evidence favorable to the State, and we may not reverse absent an abuse of discretion. McClain, 625 So.2d at 781.
¶ 22. The jury is under no obligation to believe Wingate's alibi defense. "Rather, an alibi defense simply raises an issue of fact to be resolved by the jury." Hughes v. State, 724 So.2d 893(¶ 18) (Miss. 1998). Wingate's alibi witnesses did not conclusively present evidence of Wingate's innocence. Of the three alibi witnesses, two did not remember the exact date that they purportedly saw Wingate at Capital Beer Service. One said that she saw Wingate the day before he was arrested, which happened to be three weeks after the crime was committed. Wingate's father's testimony conflicts with the statement that Wingate gave to the police. The jury was acting well within its purview to reject Wingate's alibi defense, and its verdict of *1045 guilt was not against the overwhelming weight of the evidence.
¶ 23. Further, the bank envelope containing Wingate's fingerprints was physical evidence that Wingate was the perpetrator of the crimes against Steverson. "While fingerprint evidence alone... will not suffice to support a conviction, fingerprint evidence, coupled with evidence of other circumstances tending to reasonably exclude the hypothesis that the print was impressed at a time other than that of the crime, will." Wooten v. State, 513 So.2d 1251, 1252 (Miss.1987). Steverson testified that she was the only person who knew about the bank envelope. She further testified that Wingate had never been in her bedroom so he could not have impressed his print onto the envelope at any other time. Accepting this evidence in the State's favor as true, as we are bound to do under the above standard of review, we cannot say that the evidence in this case was overwhelmingly in favor of Wingate's innocence. In fact, the evidence points overwhelmingly to Wingate's guilt. Faced with conflicting information regarding Wingate's whereabouts at the time that the crimes were committed, along with evidence that Wingate's fingerprints were discovered in a place where they should not have been, the jury performed the duties with which it was charged by resolving the conflicting fact issues against Wingate. The verdict was not against the overwhelming weight of the evidence, and the trial court did not err in overruling Wingate's new trial motion.
¶ 24. THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY OF CONVICTION OF ROBBERY UNDER COUNT ONE AND OF AGGRAVATED ASSAULT UNDER COUNT TWO AND CONSECUTIVE SENTENCES OF FIFTEEN YEARS ON COUNT ONE AND TWENTY YEARS ON COUNT TWO IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. COSTS ARE ASSESSED TO RANKIN COUNTY.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., PAYNE, THOMAS, LEE, IRVING, MYERS and CHANDLER, JJ., concur.