J-S44015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| RASHI ANDERSON, | |
| Appellee | No. 1236 EDA 2016 |

Appeal from the Order Entered April 4, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000878-2012

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED SEPTEMBER 06, 2017**

The Commonwealth appeals from the suppression court's order, granting Appellee's, Rashi Anderson, pretrial motion to suppress two out-of-court photo array identifications made by the victims in this case.  After careful review, we affirm.

The suppression court summarized the facts adduced from the suppression hearing as follows:

> Michael Cordrey testified that on September 25, 2011, he and Nicholas Meiring were walking along Spruce Street toward 42nd Street at approximately 1:30 a.m.  Upon reaching the … corner of 42nd Street, they were held up from behind by two persons.  One of the persons put a gun to Mr. Cordrey's left hip and ordered him to walk down a nearby alleyway.  He could not recall whether he saw the person's face at this point.  He followed the order and then went down to the ground in a fetal position.  The person proceeded to go through Mr. Cordrey's pockets and took his phone, wallet, and cash.  Both persons then quickly left the scene by running down 42nd Street.  Mr. Cordrey

and Mr. Meiring left immediately afterwards to attempt to find a police officer in the area.

After flagging down a police officer, Mr. Cordrey gave a statement around 2:50 a.m. to Detective Gregg Rodham of the University of Pennsylvania Police Department ("Penn Police"). Mr. Cordrey described the perpetrator who held a gun to his hip as a black male, 5'10" (five feet, ten inches) in height, weighing 180 (one hundred eighty) pounds, aged late thirties or early forties, medium build, a bald/shaved head, dark complexion, and wearing a black t-shirt and jeans. He described the gun used by the perpetrator as a black semi-automatic [handgun], not a revolver. He had given a nearly identical description to the initial officer he flagged down right after the incident.

On October 14th, Detective Rodham called Mr. Cordrey about viewing a photo array to possibly identify one of the perpetrators. At the time Mr. Cordrey was visiting friends in Princeton, New Jersey, which led Detective Rodham to email the photo array to him instead of presenting the array in-person. Mr. Cordrey identified [Appellee] as the perpetrator who he believed held the gun to his back and robbed him, although he was not completely positive at the time. He again later identified [Appellee], this time in-court at the preliminary hearing on January 20, 2012.

On cross-examination, Mr. Cordrey testified that he had three to four alcoholic beverages on the evening before the robbery. He saw the perpetrator holding the gun to his left hip for about three to four seconds before being led into the alleyway. The sky was dark but there was some artificial lighting provided by the street lights at the intersection. He did not recall ever looking back at the perpetrator holding the gun as he walked in front of them into the alleyway. He was also uncertain as to whether he saw either of the perpetrators' faces as they ran away from the scene. It then took several minutes for him and Mr. Meiring to find a police officer. They were then transported to the Penn Police Station, where Mr. Cordrey gave another description of the robber.

Three weeks later, Officer Rodham contacted Mr. Cordrey about viewing the photo array over email. Both Mr. Meiring and Mr. Cordrey were visiting friends and staying together in the same dorm room/common area. Mr. Cordrey testified that he did not recall whether or not he was present when Detective

Rodham also contacted Mr. Meiring about viewing the same photo array.

> [Defense Counsel] Q. Mr. Cordrey, were you present when Mr. Rodman (sic) called Mr. Meiring?
>
> [Mr. Cordrey] A. I don't know.
>
> [Defense Counsel] Q. You don't remember?
>
> [Mr. Cordrey] A. No.
>
> [Defense Counsel] Q. Is it possible that you don't remember?
>
> [Mr. Cordrey] A. Yes, it's possible. I don't recall, though.

[N.T. Suppression, 4/1/16, [at] 35.]

He doubted but was "not really sure" whether he and Mr. Meiring used the same computer to view the photo array. [*Id.*] Mr. Cordrey had "no idea" whether he was on the phone with Detective Rodham while viewing the photo array. [*Id.* at 35-36.] Nor did he recall how long the conversation lasted or if he received the photo array before Detective Rodham initially called him.

Mr. Cordrey could neither give an approximation of how long he had access to the photo array before faxing it back to Detective Rodham. He could not recall whether he left the room when Mr. Meiring viewed the photo array for his own identification.

> [Defense Counsel] Q. Mr. Cordrey, do you recall leaving the room so that Mr. Meiring could look at the photo array or vice versa?
>
> [Mr. Cordrey] A. I don't know.
>
> [Defense Counsel] Q. You don't recall?
>
> [Mr. Cordrey] A. I know I did mine by myself and then I might have walked away, while he did his.

[*Id.* at 38.]

Mr. Cordrey testified that the photo array remained in his email sent folder until it was automatically deleted at some unknown future date. He also testified that during the two-and-

a-half hours between receiving the photo array and faxing back a potential identification, he spent a "considerable portion of that time" looking it over. [***Id.*** at 41-42.] On redirect examination, Mr. Cordrey then testified that he did not believe he was on the phone with Detective Rodham while viewing the photo array. He also testified that he had no reason to go back and look at the photo array that remained archived in his email after he identified [Appellee].

On direct examination, Mr. Meiring testified that he and Mr. Cordrey were walking along Spruce Street toward 42nd Street at approximately 1:30 a.m. The two perpetrators approached them at the corner of 42nd Street and one of them stuck a gun in his back. The perpetrators told them both to "put your hands down, just stay silent, and walk around the corner." [***Id.*** at 45.] Once around the corner, the perpetrators took Mr. Meiring's cell phone, wallet, a credit card, ID, and some cash. Mr. Meiring remained standing throughout the ordeal but could not recall what Mr. Cordrey was doing at the time. Mr. Meiring had consumed a couple alcoholic beverages earlier in the evening, but testified that he did not feel under the influence at the time. As the robbers fled the scene, he only saw their faces for a couple of seconds.

Mr. Meiring and Mr. Cordrey ran the opposite way from the perpetrators, trying to find anyone with a phone. They found a police officer after traveling a few blocks. They both provided a description of the perpetrators. The officer then took them to the Penn Police Station, where they gave statements to Detective Rodham. Mr. Meiring gave a description of one of the perpetrators as a black male, around 5'10" (five feet, ten inches), and in his late thirties or early forties. He could not recall for which of the two perpetrators he provided this description.

On cross-examination, Mr. Meiring testified that he had consumed four or five alcoholic beverages earlier in the evening. He kept his eyes forward during the robbery and only saw the faces of the perpetrators for a couple of seconds as they turned back and looked at him and Mr. Cordrey. He could not recall whether there were any lights on in the alleyway during the robbery.

In his initial statement to the … Penn Police[], Mr. Meiring was unable to describe the person that held the gun to his back

and robbed him beyond that he was a black male with an average build wearing a black t-shirt. Mr. Meiring testified that he was unsure when he selected [Appellee] in the photo array whether [Appellee] specifically robbed him or Mr. Cordrey. He testified that he based his identification off of the four to five seconds he saw the perpetrators running away from the alleyway. When he first viewed the photo array, he immediately narrowed it down to No. 5 ([Appellee]) and No. 8. After some more time, he selected No. 5 on the photo array. He further testified that he assumed that h[e] and Mr. Cordrey used the same computer to send back their identifications to Detective Rodham. On redirect examination, Mr. Meiring testified that he looked at the photo array separately from Mr. Cordrey.

On direct examination, Detective Rodham testified that he was the assigned investigator for the robbery that occurred on September 25th. On October 12th, Detective Michael Kimmel of the Southwest Division of the Philadelphia Police Department contacted Detective Rodham about the recovery of multiple pieces of identification belonging to Mr. Cordrey and Mr. Meiring that were found on [Appellee]. Detective Rodham prepared a photo array that included [Appellee] in position No. 5 among eight (8) possible selections. On October 14th, the detective contacted Mr. Cordrey and Mr. Meiring about viewing the photo array over a computer and sending back their impressions.

On cross-examination, Detective Rodham testified that it was "absolutely not" the Penn Police's standard procedure to email a photo array to victims. [*Id.* at 77.] He further provided that it was his personal and professional preference to observe someone view a photo array in-person. Detective Rodham created the photo array that included [Appellee] with the assistance of a computer program and his own discretion.

On direct examination, Detective Kimmel testified that on September 30th he responded to a domestic assault incident involving [Appellee]. In connection to the incident, he and his partner arrested [Appellee] and performed a search incident to arrest for their safety. Various IDs and credit cards were then found on [Appellee's] person that belonged to Mr. Cordrey and Mr. Meiring.

Suppression Court Opinion (SCO), 11/18/16, at 2-8 (some internal citations omitted). Following the suppression hearing, the suppression court

> granted in part and denied in part [Appellee's] Motion to Suppress Identification. Th[e suppression c]ourt denied the suppression of the in-court identifications. However, th[e suppression c]ourt granted the suppression of the out-of-court identification[s] based upon the photo array and based its ruling on the totality of the circumstances, finding the identifications and process as being mute [*sic*] based on the circumstances. The photo array procedure was done improperly, although at no fault of the witnesses, and without evidence of any bad faith on the detective's part.

*Id.* at 8 (internal citations omitted).

The Commonwealth filed an interlocutory appeal, and certified that the prosecution would be substantially handicapped by the suppression court's order. *See* Commonwealth's Notice of Appeal, 4/28/16, at 1 (single page); *see generally* Pa.R.A.P. 311(d) ("In a criminal case, under the circumstances provided by law, the Commonwealth may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substantially handicap the prosecution."). The Commonwealth filed a Pa.R.A.P. 1925(b) statement the same day. The suppression court subsequently filed its Rule 1925(a) opinion on November 18, 2016.

The Commonwealth now presents the following question for our review:

> Did the lower court err in suppressing two armed robbery victims' out-of-court identifications, by holding that under all the

- 6 -

circumstances the photo array from which the victims selected [Appellee's] picture was unduly suggestive?

Commonwealth's Brief at 4.

> Our standard of review in addressing a challenge to the suppression court's granting of a suppression motion is well settled.
>
> > When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.
>
> *Commonwealth v. Miller*, 56 A.3d 1276, 1278–1279 (Pa. Super. 2012) (citations omitted). "Our standard of review is restricted to establishing whether the record supports the suppression court's factual findings; however, we maintain *de novo* review over the suppression court's legal conclusions." *Commonwealth v. Brown*, … 996 A.2d 473, 476 ([Pa.] 2010) (citation omitted).

*Commonwealth v. Korn*, 139 A.3d 249, 252–53 (Pa. Super. 2016).

> When determining the admissibility of identification testimony, this Court has held that
>
> > suggestiveness in the identification process is a factor to be considered in determining the admissibility of such evidence, but "suggestiveness alone does not warrant exclusion." A pretrial identification will not be suppressed as violative of due process rights unless the facts demonstrate that the identification procedure was so infected by suggestiveness "as to give rise to a substantial likelihood of irreparable misidentification."
>
> *Commonwealth v. Bruce*, 717 A.2d 1033, 1037 (Pa. Super. 1998) (citation omitted).

*Commonwealth v. Kubis*, 978 A.2d 391, 396 (Pa. Super. 2009).

In determining whether an identification procedure gives rise to a substantial likelihood of irreparable misidentification, this Court applies a totality of the circumstances test, using factors originally set forth in *Neil v. Biggers*, 409 U.S. 188 (1972). *See Commonwealth v. Edwards*, 762 A.2d 382, 391 (Pa. Super. 2000).

> Factors to be considered in evaluating the likelihood of misidentification in a particular instance are:
>
> > []the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
>
> *Manson v. Brathwaite*, … 432 U.S. [98,] 114 [(1977)]…. *See also* … *Biggers*, 409 U.S. [at] 199…. The most important factor in the totality of the circumstances test is the opportunity of the witness to view the suspect at the time of the crime. *Commonwealth v. Davis*, … 439 A.2d 195 ([Pa. Super.] 1981).

*Commonwealth v. Derrick*, 469 A.2d 1111, 1120–21 (Pa. Super. 1983) (footnote omitted).

Instantly, the suppression court determined that "under the circumstances, the identification was not reliable due to the impermissible suggestiveness pervading the improper presentation of the photo array." SCO at 10. The suppression court elaborated as follows:

> First, the decision of Detective Rodham to email the photo array to the two witnesses is deserving of great scrutiny. During his testimony, Detective Rodham conceded that it was "absolutely not" the standard procedure of the Penn Police to

- 8 -

email a photo array to victims of a crime. Further, he admitted that it was both his professional and personal preference to observe in-person a witness's reactions and comments to a photo array. While he believed this exception to standard procedure was acceptable due to the witnesses not being available in-person on October 14th, the witnesses were only temporarily out-of-state. By allowing Mr. Cordrey and Mr. Meiring to view identically constructed photo arrays from likely the same computer, while in the same dorm room/common area, one after the other, a high risk of error was created. They were left completely to their own devices to view the photo array and send back their impressions. There exists good reason for separating witnesses from each other during the presentation of a photo array as it mitigates the potential suggestiveness of the identification. Photo arrays are ordinarily conducted with a Detective physically present and each witness separated from the other.

Second, the testimony by Mr. Cordrey and Mr. Meiring regarding how they conducted the identification procedure independent of police observation contained several gaps and disparities concerning their recollections. Mr. Cordrey could not affirmatively deny that he was not present while Mr. Meiring made his own identification based off of the photo array. Mr. Cordrey could not recall if he was present while Detective Rodham discussed the parameters of the photo array with Mr. Meiring over the phone. These fuzzy recollections were neither isolated occurrences during the testimony of the witnesses, they were among many worrisome details in how the photo array was actually administered. Mr. Cordrey was further unsure whether [he] and Mr. Meiring utilized the same computer, although Mr. Meiring believes they may have. Mr. Cordrey could not recall if he left Mr. Meiring to himself to view the photo array. Lastly, Mr. Cordrey was left with unrestrained access to the photo array until it was automatically deleted by the email program at an unknown later date. Overall, the witnesses could not affirmatively corroborate having followed many of the instructions given by Detective Rodham. The likelihood of an unreliable identification was substantial due to the unmonitored presentation of the photo array to the witnesses.

…

Here, two adult witnesses were left to themselves to view identically constructed photo arrays from likely the same computer, while staying in the same dorm room/common area,

one after another, independent from any police observation. Simply put, two witnesses should not be left alone together to conduct a highly sensitive police identification procedure, the risks should be undoubtedly apparent. The detective conceded in his testimony how this was very far removed from the standard procedure of his department and for good reason. The testimony of the witnesses concerning the procedure, full of blurred recollections and equivocal denials, could not cure the overwhelming deficiencies of how the photo array was conducted. This court does not believe there was any bad faith on the detective's part nor any fault to the witnesses. However, the very substantial likelihood of an unreliable, suggestive identification arising from the many errors in how the photo array was conducted warrants the suppression of the out-of-court identification.

*Id.* at 10-12.

The Commonwealth argues that the suppression court abused its discretion in granting suppression because "the identification procedure was merely unusual, not improper or suggestive." Commonwealth's Brief at 14. The Commonwealth further contends that the witnesses' testimony, that they had followed Detective Rodham's instructions, "resulted in a procedure in which each viewed a non-suggestive array independently and reported his determination." *Id.* at 15. Essentially, the Commonwealth asserts that despite the unorthodox procedure, "there was nothing to single out [Appellee]'s photograph over the other seven in the array." *Id.*

We agree with the Commonwealth that there was nothing inherently suggestive in the array presented to the victims. Indeed, it does not appear that the suppression court indicated otherwise. The suppression court's concerns, instead, centered not on the array itself, but the manner in which it was presented and viewed. The Commonwealth has offered no legal

authorities suggesting that an otherwise non-suggestive photo array could not, in at least some circumstances, be presented in a manner that results in "a substantial likelihood of irreparable misidentification." *Kubis*, 978 A.2d at 396 (citing *Bruce*, 717 A.2d at 1037). Indeed, the applicable factor under consideration is "suggestiveness in the identification *process*," not merely suggestiveness of the photo array itself. *Id.* (emphasis added). Clearly, if while showing an otherwise non-suggestive photo array to a victim, a police officer pointed to the person under suspicion, the non-suggestive nature of the photo array would not have rendered the identification made immune from scrutiny. Indeed, in such circumstances, the non-suggestive nature of the photo array would not be a significant factor at all. Likewise, here, the brunt of the suppression court's analysis was concerned with the manner in which the array was presented to the victims, and did not suggest that there were any deficiencies in the array itself.

Moreover, the suppression court did not express any concern about the instructions actually given by Detective Rodham to the victims, Mr. Cordrey and Mr. Meiring. The court's concern was with, instead, whether the victims' testimony adequately demonstrated that they *followed* those instructions. In this regard, the court found their recollections of what occurred during the photo lineup distressingly "fuzzy," SCO at 11, and "full of blurred recollections and equivocal denials," *id.* at 11. In essence, the court did not find credible their testimony that they had followed Detective Rodham's instructions. Although not stated precisely as such, the court

- 11 -

appears to be suggesting that the victims might have collaborated on making the identification, or at least that the second victim to view the photo array may have been aware of the first victim's choice. The suppression court also seems to be suggesting that the victims' testimony did not do enough to dispel that possibility.

The Commonwealth argues, however, that the court's credibility determinations contradict the court's maintaining that there was no "fault" on the part of the witnesses. *Id.* at 12. The Commonwealth also points to parts of the victims' testimony which supported a finding that the identification procedure was not suggestive, *i.e.*, that they had not collaborated or that each had not otherwise been aware of the selection made by the other. Commonwealth's Brief at 20-22.

We reject this argument. The court's findings that the victims' recollections were not credible, and that they were also not at fault for the risk of misidentification brought about by the procedure, are not mutually exclusive conclusions, especially in the circumstances of this case. Because Detective Rodham was not physically present when they made their identifications, he could not corroborate that they had followed his instructions. Moreover, the victims gave their testimony several years after the events in question, which surely contributed to their inability to recall the details of the identification procedure. That they could not credibly testify that Detective Rodham's instructions were dutifully followed does not imply that they had intentionally, rather than inadvertently, failed to follow those

instructions. Moreover, the Commonwealth's selective choice to cite particular answers by the victims does not persuade us that their testimony, in the aggregate, was unequivocal in this regard. That the court did not reject or accept their testimony *in toto* is not demonstrative that the suppression court had abused its discretion.

Moreover, in light of the applicable standard, we find ample reasons in the record supporting the suppression court's determination that the identification procedure bore a high risk of misidentification beyond the reasons specifically addressed by the court in its opinion.

First, we consider the "opportunity of the witness[es] to view the criminal at the time of the crime," "the witness' degree of attention," and the "accuracy of [their] prior description[s] of the criminal[.]" **Brathwaite**, 432 U.S. at 114. The robbery occurred at approximately 1:30 a.m. Both victims were drinking that evening. N.T., 4/1/16, at 22, 54. Although Mr. Cordrey testified that there were street lights, he could not "quantify how light it was or how dark it was." **Id.** at 10. Mr. Meiring could not recall whether the alleyway in which they were taken had any street lights at all. **Id.** at 57.

Mr. Cordrey testified that he initially got a brief look at one of his assailants when initially confronted with a gun to his hip. **Id.** at 25. He turned toward the gun and saw the assailant's face for "about three to four seconds." **Id.** After being taken into the darker alleyway and robbed, he said he saw the two perpetrators running away, but was "uncertain about

- 13 -

seeing their faces." *Id.* at 31. Mr. Cordrey testified inconsistently about whether he was in the darker alleyway or on a better-lit street when he had observed the assailant's face. Initially, he stated that he turned and observed the man's face when he "was being led down the alleyway." *Id.* at 9. Later, he testified that he made the observation before he was led down the alleyway. *Id.* at 26. When he finally found the police, he described the suspect as a "[b]lack male, five-ten, 180 pounds, later 30s, early 40s, medium build, bald or shaved head, dark complexion, wearing a black tee shirt, and jeans." *Id.* at 13.

Mr. Meiring testified that he only ostensibly observed Appellee while the assailants were running away. *Id.* at 46. He was approximately 15 feet away from them at the time. *Id.* at 47. He did not testify as to whether he only observed a profile or the entirety of a face.[1] His description of the assailant given to police immediately after the robbery was very general, describing a "black male with a black tee shirt and with [an] average build." *Id.* at 59. In sum, the victims, while under the influence of between 3-5 drinks each, and in far less than ideal lighting, had the opportunity to observe the assailant later identified as Appellee for a few seconds each. The descriptions they gave were not entirely inconsistent, but they did differ

---

[1] It stands to reason, as a matter of common sense, that the assailant's head could not rotate 180 degrees backwards while running away from Mr. Meiring. Thus, it seems most likely that Mr. Meiring observed the profile of the man's face.

greatly in that Mr. Cordrey gave a far more detailed description as compared to Mr. Meiring's very general description. Notably, neither victim initially described an assailant with a beard.

Next we consider "the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." **Brathwaite**, 432 U.S. at 114. The victims were each shown the same photo array of eight *bearded*, bald, black men, including Appellee, three weeks after the robbery. Both victims selected Appellee, the fifth photo, located on the bottom left hand side of the photo array. On the array, Mr. Cordrey wrote "I believe it was the bottom left, No. 5, however, *I'm not positive*. But I do believe he was about five-ten, 180 pounds." N.T., 4/1/16, at 17 (emphasis added); **see also** Commonwealth's Exhibit 16. When asked if Detective Rodman had advised him "if the suspect may or may not even be in the photo array," Mr. Cordrey answered, "I didn't even realize it was a possibility." **Id.** at 18. When later asked, "when you viewed this photo array, you were not sure whether it was No. 5?", he answered, "I did not have a positive decision." **Id.** at 40.

Mr. Meiring was also equivocal in his selection. Mr. Meiring wrote out his entire thought process during his selection of No. 5 on the top of the photo array, as follows: "My first reaction when I saw the photo was #5 and #8 (bottom right and bottom left). *If I had to pick just one*, definitely #5. The men were [of] pretty average build which makes me think it couldn't be

2, 6, 7 who seem to be more heavy set."  Commonwealth's Exhibit 18 (emphasis added).

In sum, the record does not tend to establish that either victim identified Appellee with a high degree of certainty.  Several weeks had passed since they had the opportunity to observe their assailant.  Mr. Cordrey was not positive about his selection, and, distressingly, he testified that he was not even aware of the possibility that the assailant was not one of the eight persons depicted in the photo array.  Mr. Meiring, who had given a far less detailed description initially, seemed to have equivocated between two photos, and only selected Appellee after saying, "if I had to pick just one[.]" *Id.*

When added to the factors discussed by the suppression court, we conclude that the totality of the circumstances in this case tended to show that there was "a substantial likelihood of irreparable misidentification" during the unorthodox out-of-court identification procedure which occurred.  While we are reluctant to conclude that the unorthodox nature of that procedure was itself likely to result in misidentification, we acknowledge and agree with the suppression court that the victims' testimony was somewhat inconsistent with regard to how closely they followed, or understood,

Detective Rodman's instructions.[2]  As noted above, we are particularly concerned that Mr. Cordrey did not even know that it was possible that his assailant would not be on the photo array he was shown and, relatedly, that Mr. Meiring seemed compelled to make a selection.  We also deem relevant the victims' brief opportunity to view the perpetrators in poor lighting conditions, the mixed quality of initial descriptions, the discrepancies between those initial descriptions and the bearded individuals depicted in the photo array, and the victims' equivocation regarding their degree of certainty in selecting Appellee from the photo array.  Considering the totality of all these circumstances, we cannot conclude that the suppression court abused its discretion when suppressing the at-issue out-of-court identifications.

Order **affirmed**.

Judge Musmanno joins this memorandum.

Judge Shogan notes her dissent.

_____

[2] To elaborate, we do not consider the mere facts that the photo array was emailed to the victims and that Detective Rodman was not physically present when the victims' selections were made to be dispositive.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/6/2017